LOYAL C. KELLOGG *v.* JOHN A. PAGE, STATE TREASURER.

*Legal Tender Act.    Judgment.    Construction of Statutes.    Joint Resolution.    Bonds.    State Treasurer.    Words.*

The judgment of the National court of last resort, in May, 1871, that all debts whether created before or after the passage of the "Legal Tender Act" were payable in the paper issues authorized by Congress, determined and fixed the rule of legal duty.

Laws *authorizing* public officers, or trustees under a charter, to do an act, are to be construed like other statutes according to the *intent* of the legislature in enacting them, to determine whether they are *permissive* or *imperative.*

The construction of the joint resolution passed in 1870 by the Senate and House of Representatives, *authorizing* the State Treasurer to pay in coin certain State bonds issued before the passage of the "Legal Tender Act," is to be interpreted, not by evidence *aliunde,* but by the language used, the circumstances existing at the time, and the exigencies that called for its adoption. And it is *held* that the legislature intended thereby to enable the Treasurer to conform to the law as then interpreted by the courts, as to the kind of money with which to pay said bonds, and so long as that interpretation prevailed, and no more.

The bonds in question were due June 1st, 1871, and payment was soon thereafter demanded "in coin." *Held,* that the relator then had no claim *de jure* to require payment in coin, under the then interpretation of the "Legal Tender Act" by the supreme court of the United States.

Where authority is given to exercise a power beneficial to a citizen, and the right to the power exercised continues and subsists, courts hold that the *duty* to exercise that power is *absolute,* and will make it *imperative.* But this is not a case where courts have ever construed words *permissive* to be *imperative.*

There would seem to be no ground for claiming that this joint resolution, not having had the approval of the Governor, has the character of a legal enactment.

PETITION FOR MANDAMUS, addressed to the supreme court, Washington county, August term, 1871. The respondent filed an answer to the petition, to which the relator replied.

The facts alleged in the pleadings are sufficiently stated in the opinion of the court.

*Loyal C. Kellogg, pro se.*

*W. G. Ferrin* and *Heaton & Reed,* for the respondent.

The opinion of the court was delivered by

REDFIELD, J. This is a petition for mandamus. The relator avers, in his petition, that on the 22d day of November, 1870, he

was and ever since has been the lawful holder and bearer of four bonds, of the State, legally authorized and executed, amounting in the whole to the sum of three thousand dollars, with interest, and issued before the passage of the " legal tender act," so called, which was enacted by the Congress of the United States, and approved February 25th, 1862; and became payable in the year 1871. That at the October session of the legislature of this State, A. D. 1870, a joint resolution of the Senate and House of Representatives was passed, entitled " joint resolution relating to paying in coin, certain debts of the state of Vermont," wherein it was resolved " that the treasurer of the State be authorized to pay, in coin, the bonds which shall become due in 1871, and the interest thereon, which were issued before the passage of the " legal tender act" of the Congress of the United States, and to carry into effect the provisions of this resolution, the treasurer is authorized to purchase gold coin in such quantity as shall be necessary for the purpose aforesaid." That he demanded the coin, in payment of such bonds, at the proper time and place, and was refused; the treasurer offering to pay the same in treasury notes, commonly called greenbacks. That on the first day of June, 1871, when said bonds became due, and when the coin was demanded, the treasurer had in his hands coin, provided by him, under the authority of said joint resolution, sufficient to pay said bonds, and all other bonds of the State falling due at that time ; and that the treasurer had paid all the semi-annual interest becoming due on that class of bonds, after the passage of said joint resolution, on the first days of June and December, respectively, A. D. 1870, including the four bonds held by the relator.

The respondent in his answer admits that the relator was the legal holder of said four bonds ; that they were legally issued, and became due and payable as stated in the petition; and that payment in coin was demanded and refused.   The respondent justifies his refusal to pay said bonds in coin upon two grounds :

*First.*   That said bonds were solvable in legal tender notes. And that, at the time said joint resolution was passed, the supreme court of the United States, at the city of Washington, had decided in the case *Hepburn* v. *Griswold*, 8 Wall., 603, that contracts en-

tered into *before* the passage of the "legal tender act" must be solved *in coin*. That said decision was made by a divided court. That other cases, involving the same legal question, were on the calendar awaiting the decision of the same court; and it was then doubtful whether the decision of the court in *Hepburn* v. *Griswold* would stand and remain the law of the land, or be reversed. And that said joint resolution was purposely drawn, and designed to give the treasurer *discretionary* power and ability to pay this class of bonds in coin, if the law should continue to require it, and not otherwise. That in May, 1871, the supreme court of the United States, at the city of Washington, in the cases of *Knox* v. *Lee*, and *Parker* v. *Davis*, reversed the rule of law as held in *Hepburn* v. *Griswold*, and decided that the "legal tender act" of February 25th, 1862, did apply to and control contracts made previous, as well as subsequent to its passage; whereby it became the law of the land that said bonds held by the relator were ever payable in the *paper* currency authorized by said act of Congress. And therefore the respondent refused to pay said bonds, and the interest thereon, in gold coin, and insists, that in doing so, he obeyed the will of the legislature, as expressed in said joint resolution.

*Second.* The respondent insists that said joint resolution was never approved by the governor, nor ever presented to him for approval, and for this reason it has not the force of a legal enactment; and imposes no absolute duty upon the respondent.

The relator insists, in argument, that "both justice and the public interests concur in requiring the payment of a debt in a currency equivalent to, or not depreciated below that in which it originated," and that the legislature in "authorizing" the treasurer to pay this debt in coin—the same currency in which it originated,—recognized that *duty*.

The very able argument of the learned relator, in the *forum of conscience*, ought to be satisfactory to any mind. And very good reasons, as I think, could be given that no other than gold and silver, under the constitution, was intended to be the legal currency of the government. The relation of debtor and creditor; of capital and labor; the growth and stability of commerce; in

short, the whole material fabric of the State is so interwoven with, and dependent upon a stable and unfluctuating currency, that no considerate mind doubts its importance and necessity.

But it is the high prerogative of the supreme court of the United States to determine the limitations of the laws of congress ; and declare their harmony, or conflict, with the constitution. The subordination and respectful deference of all other courts within the national jurisdiction, to the adjudication of *these* questions in *that* court is a *duty* ; because such adjudication is the law of the land. The judgment of the national court of last resort, in May, 1871, that all debts, whether created before or after the passage of the " legal tender act," were payable in the paper issues authorized by congress, determined and fixed the rule of *legal duty*. And whether loans in gold coin should be solvable in the like, or in depreciated paper, was thereafter to be determined at the *forum of conscience*.

The relator further insists that the language of the joint resolution, though *permissive* in form, is *imperative* in law.

The cases are numerous where courts of the highest authority have held that laws authorizing a public officer, or trustees under a charter, to do an act, imposes upon them an imperative duty. In many other cases of like authority, the courts have held that the same or similar language is not imperative, but conveys a mere discretionary power. It is said in some cases that " *may* " means *must*. But the law has made no new lexicon in this class of cases to give exceptional meaning to words. Like all other statutes, the *intent* and purpose of the legislature is the true guide and criterion of construction. Mr. Smith, in his work on Statute and Constitutional Law and Construction, p. 724, has very clearly stated the rule. " It is the general rule in the construction of statutes that the word " may " in a public statute is to be construed " *must* " in all cases where the legislature means to impose a *positive* and *absolute* duty, and not merely to give a *discretionary power* ; but no general rule can be laid down upon this subject, further than that exposition ought to be adopted in this as in other cases, which will carry into effect the true *intent* and *object* of the

legislature in the enactment." If the case at bar is to be determined by this rule, we think its solution is easy. Up to the time of the promulgation of the judgment of the supreme court of the United States, in *Hepburn* v. *Griswold,* the treasurer had been paying principal and interest of the State bonds in the paper currency provided by congress. At the session of the legislature next after that decision in October, 1870, the governor in his annual message called the special attention of the legislature to that decision, and urged that provision be made to pay the debt of the State in accordance with the requirements of law, that no taint might attach to the good faith and credit of the State. If we consider the evidence *aliunde,* the mode and manner in which the joint resolution was drawn, modified, and shaped in committee, and the avowed reasons for the form ultimately given it, there can be no doubt that the legislature *intended* merely to authorize the treasurer in his *discretion* to pay this class of debts in *coin.* But we think the joint resolution must be interpreted by the language used, the circumstances existing at the time, and the exigencies that called for its adoption. The *assumption* that the legislature was seized with a sudden repentance and remorse for having paid the creditors of the State in a depreciated currency, and, in virtuous chagrin, resolved thereafter to pay in gold, is assuming for it an abnormal condition, and would require positive *evidence* to establish it. The highest courts in fifteen of the States, including our own, had then decided that all debts could be lawfully paid in this paper issue; and the public conviction that the " legal tender act" had an important agency in crushing an odious rebellion was so deep, that whoever questioned the moral or legal propriety of paying debts in greenbacks, was deemed oblique in morals, perverted in judgment, and wanting in patriotism. It was the *unexpected* decision in *Hepburn* v. *Griswold* that *constrained* the action of the legislature. And the public agitation resulting from that judgment, and the agencies at work to change or modify that decision, of which all but moderately acquainted with public affairs were familiar, induced that body to shape the resolution in this *discretionary* form. The legislature *intended*

to enable the treasurer to conform to the law as interpreted by the courts, *and so long as that interpretation prevailed, and no more.*

II.   At the time the demand was made the relator had no claim, *de jure*, to require payment of his bonds in gold.

The rule is well stated by Chancellor KENT, in *The Newburgh Turnpike Company* v. *Miller*, 5 J. C. R., 112, " that the word " may " means *must*, or *shall*, only in cases where the public interest and rights are concerned ; and where the public or third persons have a claim, *de jure*, that the power should be exercised."

Had the relator, on the first day of June, 1871, a claim, *de jure*, that his bonds should be paid in gold ?

The supreme court of the United States had then solemnly declared that the " legal tender act" was in no degree restrained or limited by the constitution.   And, therefore, these bonds could be lawfully paid in paper money, and a *tender* of the sum due in greenbacks would have canceled the bonds.   This is not, then, a case where courts have ever construed words *permissive* to be *imperative*.   Indeed, " may " never means *must* in *law*, any more than in philosophy.   But when authority is given to exercise a power beneficial to a citizen, and the right to have that power exercised continues and subsists, courts hold that the *duty* to exercise that power is *absolute*, and will make it *imperative*, for such is deemed the *intent* of the legislature.   The *right* and the *duty* are correlative.

III.   It is claimed that the joint resolution of the senate and house of representatives, without the approval of the governor, imposes no *legal duty* upon the treasurer.   This resolution purports to authorize the treasurer to draw money from the treasury.    The 17th sec. part 2d of the constitution of this State declares that " No money shall be drawn out of the treasury unless first appropriated by *act of legislation*."   The 11th sec. of the articles of amendment declares that " Every bill which shall have passed the senate and house of representatives shall, *before it becomes a law*, be presented to the governor," &c.   There would seem no ground for claiming that this joint resolution of the two houses

has the character of a *legal enactment.*    The governor, under the constitution of this State, is a co-ordinate branch of the government, and a necessary party to all " *acts of legislation.*"    But the court have not considered, and do not decide whether, if the petition was otherwise well founded, relief might not be given.

The writ of mandamus is refused;   the petition is dismissed, but without costs.