COURIER–JOURNAL and Louisville Times Company, the Associated Press, Lexington Herald–Leader Co., Scripps Howard, Inc. d/b/a the Kentucky Post and Kentucky Press Association, Inc.

v.

Brereton C. JONES, Governor of Kentucky.

No. 94–CA–00480–MR.

Court of Appeals of Kentucky.

March 24, 1995.

Jon L. Fleischaker, William H. Hollander, Deborah H. Patterson, Wyatt, Tarrant & Combs, Louisville, for appellants.

Mark D. Guilfoyle, Steven S. Reed, Frankfort, for appellee.

Before LESTER, C.J., and HOWERTON and MILLER, JJ.

LESTER, Chief Judge.

This is an appeal from summary judgments supported by an opinion denying the relief appellants sought under the Open Records Act, KRS 61.870 et seq.

The facts are uncomplicated in that several of the appellants requested the appellee to make available his daily appointment ledgers for various time periods, one of which was for the period December 11, 1991, to December 3, of the following year. The Governor did not accede to the request.

In this appeal it appears to be fashionable to commence the briefs with quotations, so we feel free to do likewise in this opinion when we recite Section 8 of our State Constitution to the effect:

Printing presses shall be free to every person who undertakes to examine the proceedings of the General Assembly or any branch of government, and no law shall ever be made to restrain the right thereof. Every person may freely and fully speak, write and print on any subject, being responsible for the abuse of that liberty.

Also noteworthy is a portion of the concurring opinion in *Ashland Publishing Co. v. Asbury*, Ky.App., 612 S.W.2d 749, 754 (1980):

Even though the avowed purpose of the media is that of surrogate of the people, nevertheless, it cannot be denied that generally it is a commercial enterprise which must produce an income, and in most cases, a profit, in order to sustain itself. This is usually accomplished primarily through the sale of advertising space which, along with news items, is disseminated through an area of circulation and, in a truly competitive situation, it is the publication that prevails which can spread the news at an earlier time.

As is customary in the open records act appeals, we are never informed just what the media seeks and for what purpose. This leads to the conclusion that all these efforts are a fishing expedition upon which to base some speculative publication. Be that as it may, we now turn to the legal issue.

In a sense, the appellants rely upon various sections of KRS Chapter 61.870 et seq. and cite a number of cases to support this position. Appellee counters with primarily the shield of KRS 61.878(1)(h) and (i) [now (i) and (j) after the 1994 amendments] which exempts from media inspection the following:

(h) Preliminary drafts, notes, correspondence with private individuals, other than correspondence which is intended to give notice of final action of a public agency;

(i) Preliminary recommendations, and preliminary memoranda in which opinions are expressed or policies formulated or recommended;

Neither party can direct our attention to a Kentucky case dealing with an appointment calendar from the standpoint of an open records act, but as to such a document the Courier–Journal cites *Kerr v. Koch*, N.Y.Sup. Ct. 15 Med.L.Rep. 1579 (1988), while Governor utilizes *Times Mirror Co. v. Superior Court of Sacramento*, 53 Cal.3d 1325, 283 Cal.Rptr. 893, 813 P.2d 240 (1991). We note that the *Kerr* opinion is that of a trial court having no precedential value and not appearing in the National Reporter System. *Times Mirror*, on the other hand, emanates from a sister state's court of last resort.

We believe the crux of this case to be in KRS 61.878(1)(h) concerning which we find the latest expression of our Supreme Court

to be found in *Beckham v. Board of Education of Jefferson County,* Ky., 873 S.W.2d 575, 578 (1994), which Justice Lambert, writing for the Court, said:

> KRS 61.878(1). Also excluded are "Preliminary drafts, notes, correspondence with private individuals, *other than correspondence which is intended to give notice of final action of a public agency;*" and "Preliminary recommendations, and preliminary memoranda in which opinions are expressed or policies formulated or recommended." KRS 61.–878(1)(h)–(i). From the exclusions we must conclude that with respect to certain records, the General Assembly has determined that the public's right to know is subservient to statutory rights of personal privacy and the need for governmental confidentiality. A cursory examination of KRS 61.878 reveals an extensive list of matters excluded from public access, and this also suggests an absence of legislative intent to create unrestricted access to records.

Thus, we see that within approximately a year of this cause being argued to us the concept of governmental confidentiality has not been totally diluted by the Open Records Act. The appellee reminds us of an opinion approved by then Attorney General Robert Stephens where one of the same appellants herein sought the Mayor of Louisville's appointment calendar. In part that opinion, OAG 78 626, stated:

> Not every paper in the office of a public agency is a public record subject to public inspection. Many papers are simply work papers which are exempted because they are preliminary drafts and notes. KRS 61.878(1)(g). Yellow pads can be filled with outlines, notes, drafts and doodlings which are unceremoniously thrown in the wastebasket or which may in certain cases be kept in a desk drawer for future reference. Such preliminary drafts and notes and preliminary memoranda are part of the tools which a public employee or officer uses in hammering out official action within the function of his office. They are expressly exempted by the Open Records Law and may be destroyed or kept at will and are not subject to public inspection. We believe that the Mayor's appointment

calendar is of such a nature. Although the appointment calendar contains a record of activities and contacts by the Mayor, a record which his office will probably want to keep on file for sometime, we nevertheless believe that it is nothing more than a work paper, a preliminary draft, notebook or memorandum.

Even though appellants point out, by way of brief, that "[t]his, however, is not California ..." we, nevertheless, find the logic of *Times Mirror* to be persuasive. The California open records act is not totally similar to that of this jurisdiction, but in the *Times Mirror* litigation, the press sought access to the Governor's appointment calendar. In denying the requested inspection, the court entered a lengthy opinion from which we partially quote at length:

> If the law required disclosure of a private meeting between the Governor and a politically unpopular or controversial group, that meeting might never occur. Compelled disclosure could thus devalue or eliminate altogether a particular viewpoint from the Governor's consideration. Even routine meetings between the Governor and other lawmakers, lobbyists or citizens' groups might be inhibited if the meetings were regularly revealed to the public and the participants routinely subjected to probing questions and scrutiny by the press.

> In sum, while the raw material in the Governor's appointment calendars and schedules is factual, its essence is deliberative. Accordingly, we are persuaded that the public interest in withholding disclosure of the Governor's appointment calendars and schedules is considerable.

> (2) Balancing the Interests

> Having so concluded, however, the lingering question nevertheless remains whether the public interest in nondisclosure "clearly outweighs" the public interest in disclosure. (§ 6255.) On the facts presented, we are persuaded that it does.

> The Times asserts that, "in a democratic society, the public is entitled to know how [the Governor] performs his duties, including the identity of persons with whom he

meets in the performance of his duties as Governor." Although the Times makes no effort to elaborate on this statement, its meaning is abundantly clear. In politics, access is power in its purest form. Entrance to the executive office is the passport to influence in the decisions of government. The public's interest extends not only to the individual they elect as Governor, but to the individuals their Governor selects as advisors.

One could readily imagine additional public benefits accruing from disclosure of the Governor's private itinerary, as well. It could be argued, for example, that the prospect of publicity would expand rather than contract the number and variety of persons meeting with the Governor. Disclosure might also reveal whether the Governor was, in fact, receiving a broad range of opinions, and ultimately whether the state's highest elected officer was attending diligently to the public business.

As to past schedules, the Court referenced this subject in footnote 13 at *Id.*, 283 Cal. Rptr. p. 905, 813 P.2d p. 252 saying in part:

Moreover, the risks of disclosure outline above apply in many cases regardless of whether the meetings are past or future. Participants may be chilled and discouraged by the knowledge that a meeting will routinely be disclosed, and executive judgments in ongoing policy matters may be prematurely revealed. Indeed, the Times's dogged determination to obtain even past schedules and calendars of the Governor is telling testimony to their continued vitality and relevance to the decisionmaking process.

The Court concluded at *Id.* p. 907, 813 P.2d p. 254:

"Give every man thy ear, but few thy voice," Shakespeare's Polonius advised. Those in policymaking positions of government would do well to abide the admonition. Access to a broad array of opinions and the freedom to seek all points of view, to exchange ideas, and to discuss policies in confidence, are essential to effective governance in a representative democracy. Accordingly, we are persuaded, on the instant record, that the public interest served by not disclosing the Governor's appointment calendars and schedules clearly and substantially outweighs the public interest in their disclosure.

The federal courts couch the subject under discussion in terms of "executive privilege" but even those forums recognize the concept of governmental confidentiality when Chief Justice Burger, writing for a unanimous court in *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039, 1062 (1974), said:

In support of his claim of absolute privilege, the President's counsel urges two grounds, one of which is common to all governments and one of which is peculiar to our system of separation of powers. The first ground is the valid need for protection of communications between high Government officials and those who advise and assist them in the performance of their manifold duties; the importance of this confidentiality is too plain to require further discussion. Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process. Whatever the nature of the privilege of confidentiality of Presidential communications in the exercise of Art. II powers, the privilege can be said to derive from the supremacy of each branch within its own assigned area of constitutional duties. Certain powers and privileges flow from the nature of enumerated powers; the protection of the confidentiality of Presidential communications has similar constitutional underpinnings. (Footnotes omitted).

The foregoing was supported in part by a footnote to the effect:

There is nothing novel about governmental confidentiality. The meetings of the Constitutional Convention in 1787 were conducted in complete privacy. 1 M. Farrand, The Records of the Federal Convention of 1787, pp xi-xxv (1911). Moreover, all records of those meetings were sealed for more than 30 years after the Convention. See 3 Stat. 475, 15th Cong., 1st Sess., Res. 8 (1818). Most of the Framers

acknowledged that without secrecy no constitution of the kind that was developed could have been written. C. Warren, The Making of the Constitution 134–139 (1937).

We view the Governor's appointment schedule as nothing more than a draft of what may or may never take place; a notation for inter or intra office use, so the daily affairs of the chief executive can be conducted with some semblance of orderliness; and all of which should be free from media interference. Moreover, our conclusions find basis in the logic of *Times Mirror* and in spite of some statutory difference, we apply it to the case at bar.

MILLER, Judge, dissents.

HOWERTON, Judge, concurs by separate opinion.

HOWERTON, Judge, concurring.

I concur with Chief Judge Lester's opinion. As was pointed out in *Beckham v. Board of Education of Jefferson County,* Ky., 873 S.W.2d 575, 578 (1994), "A cursory examination of KRS 61.878 reveals an extensive list of matters excluded from public access, and this also suggests an absence of legislative intent to create unrestricted access to records."

Although the Governor's daily appointment ledger is certainly different from preliminary drafts, notes, correspondence, recommendations, or memoranda, such as might be associated with judicial opinions or decision-making processes, executive policies or orders, or legislative acts, there are analogies which favor including the ledger as an exempted document under KRS 61.878. Factually, the appointment ledger is a "preliminary" draft of what the Governor's staff schedules, attempts to schedule, or expects to schedule for the Governor's daily activities. It is not an accurate log of what actually occurred. The ledger is subject to many changes and it is never corrected. Indeed, the Governor may in one way or another meet with, confer with, and talk to many people or groups who never appear on the ledger.

While we are certainly not bound by Attorney General Opinions, I do find OAG 78–626 persuasive. It was written by now Chief

Justice Robert Stephens, and it concluded that the Mayor of Louisville's appointment calendar was exempt from the Open Records Law. The Attorney General determined that the Mayor's calendar "is nothing more than a work paper, a preliminary draft, notebook or memorandum." Considering the nature of the Governor's ledger, I am unable to distinguish the two documents. The Office of the Governor's inaccurate and incomplete work sheet is presently beyond the "public's right to know."

The judgment of the Franklin Circuit Court should be affirmed.