# Herald Association, Inc., Times Argus Association, Inc. and DaCapo Publishing, Inc. v. Governor Howard Dean, M.D. and State of Vermont

[816 A.2d 469]

No. 02-190

Present: Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.

Opinion Filed November 1, 2002

*Robert B. Hemley* and *Christina Reiss* of *Gravel and Shea*, Burlington, for Plaintiffs-Appellees.

*William H. Sorrell*, Attorney General, *William E. Griffin*, Chief Assistant Attorney General, and *Mark J. Di Stefano*, Assistant Attorney General, Montpelier, for Defendants-Appellants.

**Morse, J.** Plaintiffs Herald Association, Inc., Times Argus Association, Inc., and DaCapo Publishing, Inc., all publishers of newspapers circulated throughout Vermont, filed a request under Vermont's Access to Public Records Act, 1 V.S.A. §§ 315-320, for Governor Howard Dean's daily schedule from September 2001 to the present, with continual updates. Plaintiffs sought the schedule as a means to determine how much time Governor Dean spends on nongubernatorial activities, particularly time spent on matters related to his bid for the United States presidency. The

Governor denied the request, and plaintiffs filed suit against him and the State of Vermont, as authorized by § 319(a) of the Act. The trial court entered summary judgment in favor of plaintiffs, ruling that the Governor is not entitled to claim executive privilege with respect to his daily calendar because it does not reveal information relating to policy or the Governor's decision-making process. Defendants claim on appeal that the calendar is exempt from disclosure because (1) it is not a public record under the Act; (2) the common law executive privilege permits the Governor to withhold it from the public; and (3) the record falls within the Act's so-called security exception, § 317(c)(25). We affirm in part, and vacate and remand in part.

Because the superior court disposed of this matter on summary judgment, we review the order using the same standard the lower court employed. *White v. Quechee Lakes Landowners' Ass'n*, 170 Vt. 25, 28, 742 A.2d 734, 736 (1999). Where no genuine issue of material fact for trial exists and a party is entitled to judgment as a matter of law, summary judgment is required. V.R.C.P. 56(c)(3).

The relevant facts are not disputed by the parties. The Governor's staff prepares a daily schedule that contains the Governor's appointments, and identifies where he will be and with whom he will meet during any given day. Staff also prepares a schedule of the Governor's public appearances, which is available for public inspection. Comprehensive by design, the daily calendar includes a variety of public and private events, including conferences, meetings, and descriptive information relating to the events, often including a description of the policy question or issue to be discussed at a particular meeting. By necessity, the schedule contains some personal appointments and information. The daily schedule thus generally contains more information than does the public schedule.

The creation of this schedule is a matter of choice for the Governor; no law requires him to create the record, and the Governor controls what information it contains. The schedule's creation is nevertheless an integral part of the Governor's operations. Staff prepares the schedule to plan and organize the Governor's daily activities, to facilitate policy formulation and decision making, and to communicate with the Governor's staff and security detail regarding the Governor's daily activities. In her affidavit, Kathleen O'Connor, Special Assistant to Governor Dean, explained that the Governor is necessarily "on call" at all times due to his role as Chief Executive for the State. Therefore, "[i]t is important that the Governor have a comprehensive schedule available to him and that his staff have ready access to him, regardless of the nature of his activities on any given day. A comprehensive daily schedule serves that purpose." Once the daily

schedule is prepared, it is distributed to certain members of the Governor's staff, the Secretary of Administration, and the Governor's security detail.

In their complaint, plaintiffs cited the Governor's interest in running for the United States presidency, and alleged that his "political future, and the steps he is taking to pursue it, are matters of clear public interest." They claimed the Governor's daily calendar is an "integral part of the information" relating to the public's "legitimate interest in knowing the activities and political ambitions of its elected officials, the official and unofficial political meetings and events they are holding and attending, and how such meetings and events are financed." To that end, plaintiffs sought copies of the schedule to "ascertain with whom Governor Dean is meeting, where the meeting is taking place, and whether the meeting falls within the pursuit of . . . Governor Dean's duties and responsibilities as Governor of Vermont or whether it has some other purpose." They advised defendants that they were not interested in personal information relating to the Governor's health appointments and activities, and those of his family members, or information such as hotel names, room numbers, airline flight numbers and precise geographic locations. Plaintiffs suggested that the Governor could redact such information prior to producing the records. The Governor nevertheless denied plaintiffs' request entirely, giving rise to the present controversy.

I.

The first question we must address is whether the Governor's schedule is a "public record" as the Legislature has defined the term. Under that definition, an earlier version of which we described as "sweeping," see *Caledonian-Record Publ'g Co. v. Walton*, 154 Vt. 15, 19, 573 A.2d 296, 298 (1990), "all papers, documents, machine readable materials or any other written or recorded matters, regardless of their physical form or characteristics, that are produced or acquired in the course of agency business" are public records subject to disclosure. 1 V.S.A. § 317(b). The Legislature has defined "agency" to include any "branch, instrumentality or authority of the state." § 317(a). It is hardly disputable that the Office of the Governor of the State of Vermont is a "branch, instrumentality or authority of the state." See Vt. Const. ch. II, § 1 (State of Vermont shall be governed by a governor, senate, and house of representatives); Vt. Const. ch. II, § 20 (setting forth governor's executive powers); *Kellogg v. Page*, 44 Vt. 356, 362 (1871) (governor is considered a branch of Vermont's government under Vermont Constitution). Because the Governor is an "agency" under the Act, any

paper or document "produced or acquired" during the course of the Governor's business is a public record subject to disclosure under the Act, unless some exception to the Act applies.

Defendants take issue with that conclusion, arguing that we should ignore the plain meaning of the statute and read into it, as a matter of public policy, an exception for certain records exclusively in the Governor's control. Defendants argue that any portion of a public record containing information not directly related to the Governor's duties — e.g., information related to Governor Dean's presidential aspirations — is not covered by the definition of a public record. The determinative factor under the Act is, however, whether the document at issue is "produced or acquired in the course of agency business." 1 V.S.A. § 317(b). The affidavits defendants submitted in this case establish without dispute that the schedule plaintiffs seek is an integral and essential part of the daily functioning of the Governor's office. According to defendants, the schedule's comprehensive design is necessary to facilitate the execution of the Governor's various duties and to communicate with staff and the Governor's security personnel. Given the circumstances surrounding its creation, and the essential role the calendar plays in the day-to-day functioning of the Governor's office, the calendar falls within the definition of a public record because it is "produced or acquired in the course of [the Governor's] business." See 1 V.S.A. § 317(b).

Defendants also suggest that we exempt the Governor from the definition of "agency" under the Act, paralleling the United States Supreme Court's interpretation of the federal Freedom of Information Act (FOIA) relative to the Executive Office of the President. In *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136 (1980), the Supreme Court held that FOIA excluded from the definition of "agency" certain advisors to the President of the United States even though "agency" explicitly included the Executive Office of the President. 445 U.S. at 156. Key to the Supreme Court's holding in that case was explicit legislative history explaining that "Executive Office of the President" did not encompass the Office of the President or staff whose sole purpose was to assist and advise the President. *Id.* Defendants have not demonstrated that our Legislature intended a similar exclusion under Vermont's Access to Public Records Act, and we are not persuaded that we should create one absent such a showing. Where the Legislature's intent can be ascertained from the plain meaning of the statute, we interpret the statute according to the words the Legislature used. *Brennan v. Town of*

*Colchester*, 169 Vt. 175, 177, 730 A.2d 601, 603 (1999). Our interpretation here is faithful to that canon.

■ Citing our decision in *Doe v. Salmon*, 135 Vt. 443, 378 A.2d 512 (1977), defendants also argue that a "public record" does not include the Governor's schedule because it is not a record of the Governor's official acts. Nothing in that case, nor in the language of the Access to Public Records Act, intimates that records of official acts alone are subject to public inspection. We observed in *Doe v. Salmon* that "[t]he right of all citizens to inspect public records and documents made and preserved by their government when not detrimental to the public interest has been established by the common law." *Id.* at 445-46, 378 A.2d at 515. That common law right is reflected in the Access to Public Records Act, which must be liberally construed in favor of public access to documents falling within its scope. See 1 V.S.A. § 315 (Act must be liberally construed to carry out legislative policy that free and open examination of records is necessary for persons to review and criticize decisions of governmental officers); *Trombley v. Bellows Falls Union High Sch. Dist. No. 27*, 160 Vt. 101, 106-07, 624 A.2d 857, 861 (1993) (public interest favors public's right of access to public records, and Act must be liberally construed to effect that interest). Although an official act of the Governor was at issue in *Doe v. Salmon*, the Legislature did not limit the statutory right of access to public documents to those reflecting official governmental acts only.

## II.

Our inquiry does not end with the conclusion that the Governor's calendar is a public record as defined by § 317(b) because defendants claim that two exceptions from the general disclosure requirement apply here. They claim that the schedule is covered by the common law executive privilege and may therefore be withheld under § 317(c)(4). Defendants also argue that the schedule falls within § 317(c)(25)'s exemption for documents related to security. Finally, defendants argue that they should not be required to redact the schedule to comply with plaintiffs' request because doing so is burdensome. We examine each claim separately.

## A.

■ Under § 317(c)(4), an agency may reject a public record request if complying with it "would cause the custodian to violate any statutory or common law privilege." 1 V.S.A. § 317(c)(4). Under the common law executive privilege, documents reflecting communications in the course of the Governor's decision-making and deliberative process may be withheld

from the public to protect and facilitate the Governor's consultative and decisional responsibilities. *New England Coalition for Energy Efficiency & Environment v. Office of Governor*, 164 Vt. 337, 341, 670 A.2d 815, 817-18 (1995); *Killington, Ltd. v. Lash*, 153 Vt. 628, 636-37, 572 A.2d 1368, 1374 (1990). The privilege,. which is not absolute, furthers the public interest by allowing the Governor to obtain open advice on matters of public importance. *Killington, Ltd.*, 153 Vt. at 637, 572 A.2d at 1374. Thus, the privilege extends to documents connected to the Governor's deliberations, consultations, and receipt of policy advice. See *New England Coalition*, 164 Vt. at 343-44, 670 A.2d at 819.

Documents covered by the privilege enjoy presumptive confidentiality which can be overcome only by a showing that the requester has a need for the documents that outweighs the interest in confidentiality. *Id.* at 339, 670 A.2d at 817. In *New England Coalition*, we explained the process for making a prima facie case of executive privilege in response to a request for documents. "The executive must specifically identify the documents for which the privilege is claimed, and must explain why the documents are protected by the privilege." *Id.* at 344, 670 A.2d at 820. The claim must be supported by an affidavit "based on 'actual personal consideration' by the responsible official." *Id.* (quoting *United States v. Reynolds*, 345 U.S. 1, 7-8 (1953)). Whether the Governor makes a prima facie showing that the privilege applies to the requested documents depends on the specificity of the claims supporting the privilege's assertion. In our prior cases, that determination was relatively easy because the documents subject to dispute were specific, identified communications between the Governor and state agency officials. For example, in *New England Coalition*, the documents over which the Governor asserted executive privilege were three memoranda to the Governor from the Director for Public Advocacy of the Vermont Department of Public Service (DPS) and the DPS Commissioner. *New England Coalition*, 164 Vt. at 339, 670 A.2d at 816. The affidavit in support of the privilege claim in that case, which was submitted by the Director for Public Advocacy, stated that the documents were confidential and advisory, and contained legal and policy advice. *Id.* at 345, 670 A.2d at 820. In *Killington, Ltd.*, the documents were communications directly to or from the Governor with respect to regulatory decisions involving the Killington ski area prepared for the purpose of formulating policy and making decisions regarding matters for which the Agency of Natural Resources was responsible. *Killington, Ltd.*, 153 Vt. at 631, 572 A.2d at 1371.

■ In this case, the claim of executive privilege is made broadly to cover a document containing a variety of information, some of which does not fall within the class of advisory communications at issue in *Killington, Ltd.* or *New England Coalition.* Plaintiffs' request can be construed to encompass information in the daily schedule showing (1) meetings or events unrelated to executive policy making or deliberations, including meetings and events related to Governor Dean's consideration of a potential bid for President of the United States, and (2) meetings or events related to the Governor's deliberations and policy making, including meetings with the Governor's staff, members of his cabinet, other Vermont state government officials, and others. The Governor's blanket assertion of privilege over his calendar in response to the request did not address the applicability of the privilege to each specific class of information the schedule contains. Nevertheless, for the first class of information, the blanket assertion presents no analytical difficulty because facially that category is not sufficiently related to gubernatorial policymaking or deliberations to qualify for confidential treatment under the executive privilege. Accordingly, that information must be disclosed.*

We note that the dissent contends that the information concerning the Governor's presidential aspirations is already publicly available elsewhere, including on Governor Dean's website, Fund for a Healthy America. The record shows that the Governor's Office and the Governor's website disclose Governor Dean's public appearances only, although his calendar contains private events as well. Plaintiffs sought all information in the Governor's calendar, whether public or private, to ascertain the extent to which Governor Dean's daily activities relate to the business of the State of Vermont. Governor Dean's otherwise undisclosed activities concerning a potential presidential candidacy are therefore necessarily included in plaintiffs' request. In accordance with this opinion, that information must be provided to plaintiffs.

We recognize that the Act applies only to records generated in "the course of agency business," but emphasize that the calendar as a whole was conceded by the Governor to be integral to the operation of his office. Thus, there is no inconsistency in concluding that while the schedule itself is a public record, certain specific information contained in it is so unrelated to the deliberative or policymaking process that it fails to qualify for a claim of executive privilege.

---

* To the extent schedule entries falling into that class include personal family commitments and travel details, plaintiffs have stated that they do not want that information, so the Governor may redact those details from the entries.

█ The second class of information presents a more difficult issue due to defendants' blanket assertion of privilege over the entire schedule. The inquiry into whether information is confidential under executive privilege must be specific to ensure that the public's right to inspect public documents is protected while also safeguarding the Governor's ability to engage in private deliberations over matters of public policy. The Governor's general claim of executive privilege lacks the specificity necessary to determine whether the remaining calendar entries are exempt from public disclosure. For example, Kathleen O'Connor's affidavit states that some calendar entries relate to Governor Dean's attendance at " 'political events' " — both in Vermont and out of state — as a member of the Democratic Party. She states that he meets with, and makes appearances for, candidates for elective office, again both in Vermont and elsewhere. Some of the events to which she refers are public and others are private. Governor Dean's activities pertaining to his exploration of a candidacy for President of the United States, which the dissent agrees are subject to disclosure, could fall within the scope of those two categories of calendar entries O'Connor's affidavit describes. It is likewise possible that those categories include events sufficiently related to the Governor's responsibilities as Chief Executive to qualify for executive privilege. Although we find defendants' assertion of executive privilege over the Governor's schedule in its entirety too broad, we decline to require the Governor to disclose the entirety of his schedule at this time, and remand for further proceedings before the superior court. If on remand plaintiffs seek disclosure of additional information, the Governor shall be afforded an opportunity to make a prima facie case, specific to those remaining entries, that the privilege applies. If the superior court determines that the Governor has made a prima facie showing that the executive privilege applies, plaintiffs must offer reasons why their need for the information outweighs the interest in confidentiality before any disclosure may occur. *Killington, Ltd.*, 153 Vt. at 639, 572 A.2d at 1375.

### B.

█ We must also determine whether the Governor may withhold the disputed portions of his schedule from plaintiffs under § 317(c)(25), the so-called security exception to the Access to Public Records Act. Section 317(c)(25) allows an agency to withhold "passwords, access codes, user identifications, security procedures and similar information the disclosure of which would threaten the safety of persons or the security of public property." 1 V.S.A. § 317(c)(25). Defendants argue that revealing the Governor's schedule threatens his security because it would reveal a

pattern of the Governor's activities, which would be useful to one bent on causing him harm. That argument is premised on a wholesale disclosure of the Governor's schedule rather than revelation of the narrow class of information which we order disclosed in this case. Assuming the security exception applies at all to a schedule, to shield the calendar entries ·at issue here under the Access to Public Records Act, defendants bear the burden of showing that the exception applies through a specific factual record. See *Finberg v. Murnane*, 159 Vt. 431, 438, 623 A.2d 979, 983 (1992) (agency may not discharge its burden to show an exemption under the Access to Public Records Act applies by way of conclusory pleadings or claims; a specific factual record is necessary to support the claim). That record is lacking in this case due to the generalized nature of defendants' claim over the entirety of the Governor's schedule. There is no showing that disclosure solely of the meetings or events related to the Governor's presidential aspirations would pose a security risk. In addition, plaintiffs have not requested certain travel details and personal information included in the Governor's schedule that might impact the Governor's safety, such as airline flight information and hotel accommodations, and his personal family commitments. We therefore find no error in the trial court's decision concluding that § 317(c)(25) does not apply in this instance.

## C.

Defendants also claim that redacting the schedule to meet plaintiffs' request would be burdensome, and therefore we should not require them to produce the information. The Access to Public Records Act does not allow an agency to withhold public records simply because complying with the request is difficult or time consuming. The Act provides a different remedy in those circumstances. Under § 316(c), an agency may "charge and collect the cost of staff time associated with complying with a request for a copy of a public record" if "the time directly involved in complying with the request exceeds 30 minutes." 1 V.S.A. § 316(c)(1). We leave it to the Governor and his staff to determine the most effective and efficient way to provide plaintiffs with the information subject to disclosure under this opinion.

## III.

We turn finally to plaintiffs' argument that the superior court erred by denying their request for attorney's fees. We review the lower court's decision on this issue under our abuse-of-discretion standard: the decision will stand on appeal unless the requesting party shows that the court

either failed to exercise its discretion altogether or exercised it for reasons that are clearly untenable or unreasonable. *Burlington Free Press v. Univ. of Vt.*, 172 Vt. 303, 307, 779 A.2d 60, 64 (2001). In this case, the backdrop to that standard is the legislative policy requiring swift resolution of disputes under the Access to Public Records Act. See *Finberg*, 159 Vt. at 433, 623 A.2d at 981 ("The Access to Public Records Act . . . is aimed at expeditious resolution of disputes over whether a citizen will have access to a public record."). Plaintiffs suggest that the court erroneously denied their request because defendants' litigation of this matter ran counter to the interest in prompt resolution of their requests. They characterize defendants' actions, and their supporting arguments, as unreasonable. The superior court disagreed, noting that this was a case of first impression in Vermont. We find no abuse of the superior court's discretion in this instance. Although we disagree with defendants' position in part, we do not find it devoid of any reasonable support. The trial court's rationale for denying attorney's fees was not clearly untenable or unreasonable, and we affirm its decision. *Burlington Free Press*, 172 Vt. at 307, 779 A.2d at 64.

*The trial court's order is affirmed insofar as it requires the Governor to disclose those portions of his daily calendar reflecting meetings and events related to Governor Dean's potential candidacy for President of the United States. The remainder of the order is vacated and remanded to the trial court for further proceedings consistent with the views expressed herein.*

**Amestoy, C.J.,** concurring. I concur with that portion of the majority's opinion which concludes: (1) the Governor's daily schedule prepared by gubernatorial staff is a public record, but no law requires creation of the record and the Governor controls what information it contains; (2) plaintiffs' request for the schedule of meetings and events related to Governor Dean's decision to seek the office of President of the United States requests information insufficiently related to gubernatorial policymaking or deliberations to qualify for confidential treatment under executive privilege; (3) the Governor should not be compelled to release information from his daily schedule that may be protected by executive privilege, and this case should be remanded to enable the superior court to determine the applicability of the privilege to daily schedule information unrelated to the Governor's bid for the presidency.

I write to note my agreement with Justice Skoglund that while "the raw material in the Governor's appointment calendars and schedules is factual, its essence is deliberative." *Times Mirror Co. v. Superior Ct.*, 813 P.2d

240, 251-52 (Cal. 1991). While the affidavits submitted by the State may be sufficient to establish a prima facie case for executive privilege as to information in the Governor's daily schedule related to the responsibilities of fulfilling the Office of Governor, the fact remains that the affidavits were submitted to support a claim of privilege to all information in the schedules. Hence, although I find Justice Skoglund's analysis persuasive, I believe it is premature given the posture of the case as it comes to us.

Finally, I note that although we have determined that disclosure solely of meetings or events related to the Governor's presidential aspirations does not trigger the so-called "security exception" to the Public Records Act, see 1 V.S.A. § 317(c)(25), that does not foreclose the relevance of a security exception to the facts as they may be developed on remand. Judgments by those responsible for providing security to the Governor are informed by specific experience. It is reference to that experience that may best meet the defendants' burden to demonstrate the factual record necessary to support the application of the security exception.

**Skoglund, J.,** concurring in part, dissenting in part. The fundamental question presented by this appeal is whether the public interest in disclosure of the Governor's daily calendars outweighs the chief executive's interest in maintaining the confidentiality of those documents. The Court declines to answer this question in today's decision. Instead the majority holds that information in the Governor's calendars showing "meetings or events unrelated to executive policy making or deliberations, including meetings and events related to Governor Dean's consideration of a potential bid for President of the United States," 174 Vt. at 357, 816 A.2d at 475, is not sufficiently related to gubernatorial policymaking or deliberations to qualify for confidential treatment under the executive privilege and must be disclosed.

I concur with this general conclusion. However, the Court then sends the case back to the trial court for another look at those portions of the Governor's scheduling calendar that list meetings or events related to the Governor's deliberations and policy making, including meetings with the Governor's staff, members of his cabinet, other Vermont state government officials, and other individuals because "[t]he Governor's general claim of executive privilege lacks the specificity necessary to determine whether the remaining calendar entries are exempt from public disclosure." *Id.* at 358, 816 A.2d at 476.

I respectfully submit that the trial court had affidavits before it that established a prima facie case for executive privilege. I submit further that the rationale set forth in those affidavits is fully applicable to those portions of the Governor's calendar that the Court has remanded for

further consideration, and that the affidavits are sufficiently specific to meet the chief executive's burden. I would decide the issue presented.

On the record before us, I would hold that the trial court erred in concluding that the calendars contain only factual information and that "communications to the governor that are primarily factual are not protected from disclosure by executive privilege." As explained more fully below, the fact/opinion dichotomy is contrary to the decisional law governing this area, contrary to the record in this case, and contrary to common sense and political reality. A remand without deciding whether the trial court's approach was sound is inefficient. For these reasons, I respectfully dissent.

First, let me state the obvious. Information on the Governor's activities, appearances, and events in the national political arena are currently available to the press and all members of the public on the Governor's action committee website — Fund for a Healthy America. Second, I agree with the Court's conclusion that the Governor's schedule is a "public record" under the Public Records Act, and that the Governor is subject to the Act.

These preliminary matters aside, it is important to emphasize that, while new to this Court, the fundamental question presented — whether executive privilege may apply to the Governor's calendars — is governed by principles that are well settled. We have recognized that the doctrine of executive privilege has both "constitutional and common-law roots." *Killington, Ltd. v. Lash*, 153 Vt. 628, 636, 572 A.2d 1368, 1374 (1990). At both the state and federal levels, the doctrine is inextricably linked to the principle of separation of powers; the executive privilege " 'protects and insulates the sensitive decisional and consultative responsibilities of the Governor which can only be discharged freely and effectively under a mantle of privacy and security.' " *Id.* (quoting *Nero v. Hyland*, 386 A.2d 846, 853 (N.J. 1978)). Indeed, we have held that the "need for honest and open communication between the chief executive and advisors" distinguishes the Governor from all other executive agencies, which — unlike the Governor — may be required to demonstrate that withheld documents are both "pre-decisional" and related to a particular decision. *New England Coalition for Energy Efficiency & Environment v. Office of Governor*, 164 Vt. 337, 342, 670 A.2d 815, 818 (1995). "The decision-making process of the chief executive," in contrast, does not lend itself to such arbitrary "linedrawing." *Id.* at 341-42, 670 A.2d at 818.

As numerous courts, including our own, have noted, the privilege protects " 'the deliberative *process* of government and not just deliberative *material.*' " *Times Mirror Co. v. Superior Court*, 813 P.2d

240, 250 (Cal. 1991) (quoting *Mead Data Cent., Inc. v. United States Dep't of Air Force*, 566 F.2d 242, 256 (D.C. Cir. 1977)) (emphasis in original). The interest protected ultimately is not the Governor's right to keep secrets, but the people's right to a fully informed and effective government. "By promoting the effectiveness of the governing process, the privilege protects the welfare of the public, not the government official." *New England Coalition*, 164 Vt. at 345, 670 A.2d at 820.

The separation-of-powers principle at the heart of the executive privilege informs the procedure for resolving disputes, as well. To invoke the privilege, the executive must file a supporting affidavit. The affidavit must be based on " 'actual personal consideration' " by the responsible official, specifically identify the documents for which the privilege is claimed, and explain why the documents are protected by the privilege. *Id.* at 344, 670 A.2d at 820 (quoting *United States v. Reynolds*, 345 U.S. 1, 7-8 (1953)).

Such an affidavit is sufficient to make out a prima facie claim. Once that is established, "the requester has the burden of providing reasons why the need for the information outweighs the interest in confidentiality." *Killington, Ltd.*, 153 Vt. at 639, 572 A.2d at 1375. This procedure thus "allows the executive branch to self-certify a basis for executive privilege," while accommodating "appropriate [judicial] review at sensitive junctures in the process." *Id.* at 641, 572 A.2d at 1376.

The Governor has fully complied with these requirements. In response to the petitioners' suit for disclosure of his daily and weekly schedules, the Governor submitted affidavits by two high level policy advisors identifying the documents in question, their contents, the manner in which they are produced, the specific persons to whom they are distributed, and the reasons for their confidential nature under the executive privilege. The trial court nevertheless ruled in favor of petitioners, finding that the calendars contained no express advice or opinions, and summarily concluding therefore that the privilege did not apply.

It is commonplace to observe at the threshold of such cases that the executive-privilege doctrine protects materials connected to deliberations and policy advice, not purely factual information. This statement generally marks the beginning of a court's discussion, however, not the end of analysis. As noted in *Hamilton v. Verdow*, 414 A.2d 914, 925-26 (Md. 1980) (emphasis added) (internal citations omitted):

> However, material cannot always "easily be separated into fact finding and decision making categories." Moreover, some factual material is entitled to a degree of protection under the privilege, although not to the same extent as opinions and

recommendations. This would include facts obtained upon promises or understandings. of confidentiality, investigative facts underlying and intertwined with opinions and advice, *and facts the disclosure of which would impinge on the deliberative process.*

We are not the first court to consider whether calendars, schedules, or similar materials setting forth the time, place, subject matter, or identity of persons involved in private discussions with the Governor reveal "facts the disclosure of which would impinge on the deliberative process." Most other courts have found that disclosure of such documents would substantially impair the Governor's deliberative and decisionmaking functions, and have concluded that a generalized public interest in the Governor's activities is insufficient to overcome the claim of executive privilege. See *Times Mirror Co.*, 813 P.2d at 251-53 (concluding that disclosure of Governor's calendars and schedules would reveal the "substance or direction of the Governor's judgment and mental processes," and that "the public interest in nondisclosure clearly outweighs the public interest in disclosure"); *Courier-Journal v. Jones*, 895 S.W.2d 6, 10 (Ky. Ct. App. 1995) (relying on "the logic of *Times Mirror*" to hold that Governor's daily appointment ledgers are exempt from disclosure under Open Records Act); *Taylor v. Worrell Enters., Inc.*, 409 S.E.2d 136, 138 (Va. 1991) (plurality opinion holding that disclosure of Governor's phone records would have undue "chilling effect" on Governor's use of telephone to confer with others). But cf. *Office of Governor v. Washington Post Co.*, 759 A.2d 249, 271-73 (Md. 2000) (Governor not entitled to blanket claim of executive privilege over telephone records and schedules, but may establish on remand that disclosure of specific information would interfere with deliberative process.).

In so holding, the courts have rejected the artificial fact/substance dichotomy that formed the basis of the trial court's decision. Instead the critical inquiry, as the California Supreme Court observed, is "less on the *nature* of the records sought and more on the *effect* of the records' release." *Times Mirror*, 813 P.2d at 250 (emphasis added). The key question is whether disclosure " 'would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform

its functions.' " *Id.* (quoting *Dudman Communications Corp. v. Dep't of Air Force*, 815 F.2d 1565, 1568 (D.C. Cir. 1987)).*

Applying this test, the courts have concluded that factual data identifying the time, place, and identity of participants in discussions with the Governor "is the functional equivalent of revealing the substance or direction of the Governor's judgment and mental processes; such information would indicate which interests or individuals he deemed to be of significance with respect to critical issues of the moment. The intrusion into the deliberative process is patent." *Times Mirror*, 813 P.2d at 251. The court's conclusion in *Courier-Journal* was the same, noting that "while the raw material in the Governor's appointment calendars and schedules is factual, its essence is deliberative." 895 S.W.2d at 8 (quoting without citation *Times Mirror*, 813 P.2d at 251-52); see also *Taylor*, 409 S.E.2d at 138-39 (rejecting assertion that telephone data from Governor's office were "devoid of substantive information," and finding on the contrary that they had "intrinsic significance"); *Cofield v. City of LaGrange*, 913 F. Supp. 608, 615 (D.D.C. 1996) (observing that agency's "act of compiling information" may reflect "exercise of judgment by agency" requiring protection of purely factual material).

Compelled disclosure of such information, the courts have also concluded, would ultimately inhibit the flow of information to the Governor. "If the law required disclosure of a private meeting between the Governor and a politically unpopular or controversial group, that meeting might never occur." *Times Mirror*, 813 P.2d at 251; accord *Courier-Journal*, 895 S.W.2d at 8 (quoting *Times Mirror*). Even routine meetings between the Governor and other lawmakers, lobbyists or citizens groups might be inhibited if the meetings were regularly revealed to the public. As the court in *Taylor* stated: "A lack of candor or an unwillingness to participate in the decision making process is as likely to flow from the compelled disclosure of the *fact* of consultation as from the disclosure of the *content* of the consultation." 409 S.E.2d at 139 (emphasis added); see also *Cofield*, 913 F. Supp. at 617 (holding that agency documents with "internal routing notations" were exempt from disclosure

---

* Even the one decision which declined to hold unequivocally for the Governor recognized that purely factual material contained in the Governor's telephone records and appointment schedules might contain information from which substantive content could be inferred. See *Office of Governor*, 759 A.2d at 271-72. It held, however, that the Governor was not entitled to a "blanket claim of executive privilege" with respect to the materials sought and the burden-shifting presumption attendant thereto. *Id.* Instead it remanded to the trial court to allow the Governor to make an evidentiary showing that specific factual information in the records sought "will interfere with the deliberative process in the Governor's Office." *Id.* at 273.

"because such notations may reasonably lead to identification of those individuals involved in the decisionmaking process, a result that could chill open and frank discussions within the agency, undermining the deliberative process").

The record in this case underscores the soundness of the reasoning of the courts cited above. In her affidavit, Kathleen O'Connor, a principal advisor to the Governor, described the complex process of creating the Governor's daily schedule and how it ultimately reflects the relative importance of the various items included. Meetings with local, state, and federal legislators, discussions with advisors, interviews with potential appointees, and private conversations with individuals on policy issues are all included in the schedule. These meetings, O'Connor notes, provide the Governor with "a variety of different viewpoints, including viewpoints which are unpopular." O'Connor goes on to explain that in her experience many private meetings "without the glare of media attention" are essential for the Governor to obtain such viewpoints and to formulate policy, and she cautions that the flow of information to the Governor would be tangibly inhibited if the schedules were disclosed. Kathleen Hoyt, a public servant with nearly thirty years of experience, and the current Secretary of Administration, stated unequivocally in her affidavit that "public disclosure of the governor's daily schedule would compromise the governor's ability to receive frank advice" and erode his ability to formulate policy.

Petitioners filed no affidavits or other evidentiary materials to rebut these statements grounded in decades of political experience. Whether the affidavits set forth undisputed "facts" entitled to acceptance on summary judgment, or mere "opinions" as petitioners claim, they are certainly informed reflections of the reality of public-policy decisionmaking deserving of considerable weight, as courts elsewhere have found. Disclosure of the existence of such meetings, their time and place, subject matter, and the identity of the participants would, in fact, provide a window into the substance or direction of the Governor's judgment and mental processes, and exert a chilling effect on the willingness of persons, particularly those outside of government, to participate in such meetings.

This case presents the separation-of-powers principle underlying the executive privilege doctrine in its starkest form. The Governor has asserted the privilege over his own daily schedule of activities, including various private meetings with advisors and individuals both in and out of government, which detail the subject of the meetings, their time and location, and the identity of the participants. He contends that although the documents in question do not contain the substance of those

discussions, they nevertheless reflect an exercise of judgment offering a window onto the deliberative processes of his office, and require protection to preserve the full opportunity for frank expression and discussion at the executive level.

I do not suggest that judicial respect for the integrity of the executive branch requires that we simply defer to the Governor's view on the scope of the executive privilege. I do believe, however, that a careful and balanced review of the pertinent cases and arguments leads to the conclusion that although — in the words of *Times Mirror* — "the raw material in the Governor's appointment calendars and schedules is factual, its essence is deliberative." 813 P.2d at 251-52. Accordingly, I would hold that the Governor is entitled to claim executive privilege over his daily and weekly schedules.

It remains, therefore, to answer the essential question posed by this appeal: whether the asserted interests in disclosure of the Governor's schedules outweigh the claim of executive privilege. To overcome the presumption of confidentiality, petitioners here argue that they, and the public, are entitled to the Governor's daily schedules "based upon a need to determine how Governor Dean is expending public funds and resources, and how he is allocating his time and energies between his official duties as Governor of the State of Vermont and his political aspirations" to run for President of the United States. The schedules will reveal "whether his efforts to secure and enhance his political future are taking precedence over his daily duties and responsibilities as Governor of the State of Vermont."

I have no quarrel with the Court's conclusion that meetings and events specifically related to the Governor's consideration of a potential presidential race are sufficiently divorced from the executive decisionmaking process as to fall outside the scope of the privilege, although I note that such information is generally available elsewhere. Petitioners did not, however, limit their request to such specific information, but requested disclosure of *all* of the calendars in their *entirety*, so as to compare the time spent on the Governor's national campaign with his time spent governing Vermont. It is here that I part company with petitioners, and the Court.

No extensive discussion is necessary to establish that we are a society dedicated to the concept of open government. Whether our elected officials are diligently attending to their public duties is a legitimate source of concern and a valid argument for disclosure of records kept in the course of agency business. The real issue is not whether petitioners'

arguments have substance, but whether they are sufficient to overcome the Governor's assertion of executive privilege in this case.

A similar argument was raised by the petitioners in *Times Mirror*, who sought the Governor of California's schedules to determine whether he was diligently attending to his official duties. In concluding that this general interest was insufficient to overcome the Governor's claim of executive privilege, the court made the following observation, which I believe applies with equal force here:

> The answer to [petitioners'] arguments is not that they lack substance, but pragmatism. The deliberative process privilege is grounded in the unromantic reality of politics; it rests on the understanding that if the public and the Governor were entitled to precisely the same information, neither would likely receive it. Politics is an ecumenical affair; it embraces persons and groups of every conceivable interest: public and private; popular and unpopular; Republican and Democratic and every partisan stripe in between; left, right and center. To disclose *every* private meeting or association of the Governor and expect the decisionmaking process to function effectively, is to deny human nature and contrary to common sense and experience.

813 P.2d at 252 (emphasis in original).

The cogency of this response to petitioners' claim is — in my view — self-evident, and leads inescapably to the conclusion that, without more, a general desire to determine how the chief executive's time has been spent is insufficient to overcome the Governor's interest in maintaining the confidentiality of his or her daily schedules. It is possible, of course, simply to reject the premise that potential participants in the political process will be inhibited by the prospect of publicity, or to accept it but insist that they be made of sterner stuff. To assert a knowledge superior to that of experienced officials and other courts that have addressed this issue, however, requires a degree of certainty than I am unwilling to claim.

Moreover, we need not conclude that the Governor's schedules must remain inviolate under all circumstances. A future case, based on a more compelling showing of need — evidence, for example, of corruption, misuse of public funds, or gross dereliction of duty — could lead to a different conclusion. I would simply hold that on the record before us the presumption of confidentiality has not been overcome. Therefore, I would reverse the judgment.

Although it is not necessary, in my view, to address the Governor's subsidiary claim based on the security exception under the Public Records

Act, the issue compels comment. The Governor argued in his pleadings that the schedules were exempt from disclosure under § 317(c)(25), which allows an agency to withhold "passwords, access codes, user identification, security procedures and similar information the disclosure of which would threaten the safety of persons or the security of public property." He filed an affidavit by the commander of his security detail, a state police lieutenant and a law enforcement officer with twenty years' experience, attesting to the fact that disclosure of the detailed information in the schedules regarding the Governor's daily itinerary would "pose a substantial security risk to the Governor and those with whom he interacts." Petitioners disputed the claim on the ground that it was unduly speculative, and the trial court agreed.

Security is a malleable concept. Patterns of activity such as travel itineraries, hotel accommodations, means of transportation, times of arrival and departure, and persons traveling with the Governor may reflect decisions relating not only to the Governor's convenience, but to his security, as well. Thus, the detailed schedules themselves constitute a form of security. They are treated as such by the Governor's office, which maintains strict confidentiality in their distribution, and that security protocol should not be broken.