Bennington Housing Authority v. Bush (2006-094)

2007 VT 60

[Filed 20-Jul-2007]


 NOTICE: This opinion is subject to motions for reargument under V.R.A.P.
 40 as well as formal revision before publication in the Vermont Reports. 
 Readers are requested to notify the Reporter of Decisions, Vermont Supreme
 Court, 109 State Street, Montpelier, Vermont 05609-0801 of any errors in
 order that corrections may be made before this opinion goes to press.


 2007 VT 60

 No. 2006-094


 Bennington Housing Authority Supreme Court

 On Appeal from
 v. Bennington Superior Court


 Diane Bush and Scott Heaton September Term, 2006


 Theodore S. Mandeville, Jr., J. (Ret.), Specially Assigned

 James J. Cormier, Jr. of Cormier and Cormier, Bennington, for
 Plaintiff-Appellee.

 R. Drew Palcsik, Vermont Legal Aid, Inc., Rutland, for
 Defendants-Appellants.


 PRESENT: Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.

 ¶ 1. SKOGLUND, J. The Bennington Housing Authority (BHA) brought
 an eviction action against appellants, Diane Bush and Scott Heaton, on the
 ground that they withheld information from their lease application which,
 if known, would have disqualified them as eligible lessees. Ms. Bush and
 Mr. Heaton appeal the trial court's determination that they committed fraud
 in the inducement and that BHA appropriately exercised its discretion in
 evicting the family when, five years after admitting the family, it
 discovered material inaccuracies in their application concerning one family
 member. We reverse. 
 
 ¶ 2. In April of 2000, Ms. Bush, her daughter, and Mr. Heaton were
 homeless, and Ms. Bush was pregnant with triplets. Ms. Bush filled out an
 application for public housing, listing herself as head of household. She
 provided information on her income, vehicles, previous landlord, and
 personal references. In a section entitled "other required information"
 the application asked two questions about criminal history which Ms. Bush
 answered in the negative. The answers were truthful as to Ms. Bush. She
 testified that she did not think Mr. Heaton's criminal history was required
 on the form. She also testified that she asked Mr. Heaton to sign the
 section of the form that authorized the housing authority to do a record
 check on them both. BHA ran a background check on the couple which
 revealed no criminal history in Vermont. BHA admitted the family to the
 subsidized housing unit, and the family has lived there since May of 2000. 
 Although there have been one or two termination notices, all complaints
 have been satisfactorily resolved. The director of BHA testified that the
 family had been tenants in good standing at all times relevant to the
 appeal.

 ¶ 3. Each year, public-housing tenants are required to affirm in
 writing that they do not exceed the income caps for subsidized housing, and
 that all the answers they gave on the application are true and correct. In
 2003, BHA upgraded its background checking software, and in 2005, BHA ran a
 new check on Ms. Bush and Mr. Heaton. The search revealed that Mr. Heaton
 had a 1992 conviction for sale of a controlled substance and a 1994
 conviction for burglary, both in New York State. 

 ¶ 4. On March 16, 2005, BHA sent Ms. Bush and Mr. Heaton a notice of
 termination of their tenancy in accordance with the provision of the lease
 which states "[m]anagement shall not terminate or refuse to renew this
 lease other than for serious and repeated violations of material terms of
 the lease such as failure . . . to fulfill the tenant obligations as set
 forth herein, or for other good cause." The letter claimed that the
 tenants gave false information on their application, referencing Mr.
 Heaton's criminal record in New York. Thus, BHA sought to terminate the
 lease due to misrepresentation on the application filed in 2000. 

 ¶ 5. After receiving the eviction letter, Ms. Bush and Mr. Heaton
 participated in an informal conference with Deborah Reed, BHA's executive
 director. According to the testimony of the executive director, Ms. Bush
 admitted she was aware Mr. Heaton had a criminal record but claimed she did
 not know the specifics such as whether he had been convicted of a felony. 
 During that meeting, Mr. Heaton offered to move out if Ms. Reed would allow
 the rest of the family to stay, but she refused. Ms. Reed testified at
 trial that she did not consider any course of action other than evicting
 the entire family. She further testified that she knew she had the
 authority to evict them and the discretion to choose not to do so based on
 materials she received from the U.S. Department of Housing and Urban
 Development (HUD). 

 ¶ 6. The trial court concluded that Ms. Reed had not abused her
 discretion in deciding to evict the entire family. Further, the court
 found by clear and convincing evidence that Ms. Bush had fraudulently
 misrepresented the family's position on the application. For these reasons
 the trial court affirmed Ms. Reed's decision. 

 ¶ 7. We review the trial court's findings concerning BHA's abuse of
 discretion for clear error. N.A.S. Holdings, Inc. v. Pafundi, 169 Vt. 437,
 438, 736 A.2d 780, 783 (1999). Our review of its conclusions of law is
 non-deferential and plenary. Id. at 438-39, 736 A.2d at 783. In reviewing
 a trial court's conclusion that fraud in the inducement was proven by clear
 and convincing evidence, "[t]he test . . . is not whether this Court is
 persuaded that there was clear and convincing evidence, but whether the
 factfinder could reasonably have concluded that the required factual
 predicate was highly probable." In re E.T., 2004 VT 111, ¶ 13, 177 Vt.
 405, 865 A.2d 416 (quoting In re N.H.,168 Vt. 508, 512-13, 724 A.2d 467,
 470 (1998)). Where the record indicates that the trial court clearly erred
 in finding clear and convincing evidence, this Court will reverse such a
 finding. Id. at 514, 724 A.2d at 471.

 ¶ 8. We turn our attention first to the trial court's finding that Ms.
 Bush and Mr. Heaton committed fraud in the inducement. Although BHA made a
 general allegation of fraud in its complaint, it has not met its burden of
 proof. To succeed on this claim, BHA must prove the elements of fraud by
 clear and convincing evidence. Gavala v. Claassen, 2003 VT 16, ¶ 5, 175
 Vt. 487, 819 A.2d 760 (mem.) (in all cases where fraud is alleged, it must
 be proved by clear and convincing evidence). 
 
 An action for fraud and deceit will lie upon an intentional
 misrepresentation of existing fact, affecting the essence of the
 transaction, so long as the misrepresentation was false when made
 and known to be false by the maker, was not open to the defrauded
 party's knowledge, and was relied on by the defrauded party to his
 damage.

 Union Bank v. Jones, 138 Vt. 115, 121, 411 A.2d 1338, 1342 (1980); see also
 Powell v. D.C. Housing Auth., 818 A.2d 188, 196-97 (D.C. 2003) (outlining
 the elements of common law fraud in the context of a termination of public
 housing subsidy payments for under-reporting income).

 ¶ 9. Relying on its finding that both Ms. Bush and Mr. Heaton knew that
 they were required to reveal a felony conviction or involvement with drugs
 on the application form, and further relying on the finding that both
 applicants knowingly failed to do so, the court found the
 misrepresentations were false when made, that they were known to be false
 by the makers and were meant to be relied upon by the injured party. The
 evidence does not support these findings or the conclusion. "To find that
 a misstatement was made with knowledge of its falsity, the person accused,
 and not a hypothetical reasonable person must be found to have known that
 the statement was false, or to have made the statement with reckless
 indifference as to its truth." Powell, 818 A.2d at 197-98 (citation and
 quotation omitted). Here, there was no evidence of any intent to deceive
 by Ms. Bush. The only evidence adduced indicated that Ms. Bush knew Mr.
 Heaton had participated in some criminal activity in the past. The housing
 application, however, asks only about the criminal history of the head of
 household in a section called "other required information." Question
 number seven in that section asks, "have you ever been charged with a
 felony? Yes___ No___" Question number eight asks "are you currently using
 illegal drugs? Yes____ No___" Question number nine asks "have you ever
 been charged with the sale, distribution or possession of illegal drugs? 
 Yes__ No___" (Emphasis added). The form contains other sections that
 allow space for different information to be supplied for each family
 member, but the "other required information" section does not. The only
 evidence adduced on this point was Ms. Bush's testimony that, at the time
 she filled out the housing application, she did not know that Mr. Heaton
 had committed a felony or that he had been involved in drugs. She knew
 only that he "had a past" and had been incarcerated at some time before
 they met.
 
 ¶ 10. In addition, Ms. Bush testified that she knew the housing
 authority would conduct a criminal record check when she submitted the
 application. Mr. Heaton signed the authorization for a criminal record
 check as well. This is not evidence of intent to defraud. The BHA
 testified that it investigated the information supplied on the application
 and found no information connecting either party to drug use or felony
 charges in Vermont, and accordingly, the application was accepted. Ms.
 Bush could reasonably rely on the housing authority to pick up any criminal
 activity which would be troublesome to it. However, the trial court found
 that misrepresentations were made not once, but repeated in subsequent
 applications, and the court concluded that "[t]o maintain that the failures
 to disclose were not made with fraudulent intent would fly in the face of
 the evidence and common sense." We disagree. No evidence was presented to
 indicate that Ms. Bush's knowledge of Mr. Heaton's record changed in the
 years that Mr. Heaton and Ms. Bush signed the five additional
 certifications. There was no reason for the tenants to believe, having
 already authorized a record check prior to being admitted to the housing
 project, that Mr. Heaton's past criminal record would disqualify them from
 housing. Thus, evidence of misrepresentation is scant at best, and
 evidence that the information given was "known to be false," Union Bank,
 138 Vt. at 121, 411 A.2d at 1342, is even harder to come by. 
 
 ¶ 11. Moreover, BHA did not show that the information was not "open to
 the defrauded party's knowledge" or that the information was "relied on by
 the defrauded party to his damage." Id. There was no evidence in the
 record that either Mr. Heaton or Ms. Bush knew the limitations of the BHA
 system when they applied for housing. And BHA did not rely on the
 information provided by Ms. Bush - it did indeed conduct its own criminal
 record check. The fact that BHA did not run a more extensive check does
 not tend to prove an intent to defraud on Ms. Bush or Mr. Heaton's part. 
 Finally, BHA has not made any claim of damage. For these reasons, it was
 error for the trial court to find that fraud had occurred.
 
 ¶ 12. Next, we must examine the trial court's formulation of the
 standard of review. The trial court's order states, "[a]buse of
 discretion, as the term is currently applie[d], appears to mean that
 another reasonable person acting under the same circumstance would have
 resorted to another course of action." The trial court's articulation of
 the abuse-of-discretion standard is in error, and for this reason, as well,
 we must reverse. When reviewing for abuse of discretion, we must determine
 whether the court, and BHA, "failed to exercise . . . discretion altogether
 or exercised it for reasons that are clearly untenable or unreasonable." 
 Herald Ass'n v. Dean, 174 Vt. 350, 360, 816 A.2d 469, 478 (2002). In other
 words, an entity, vested with discretion, abuses that discretion when it
 behaves as if it has no other choice than the one it has taken, or when it
 makes a decision for which there is not adequate support.

 ¶ 13. The regulations clearly vest public housing authorities with
 discretion in dealing with violations of lease terms or regulations. 24
 C.F.R. § 966.4(l)(2) (2006). BHA certainly may evict an entire family for
 the misdeeds of one member, but it need not do so. Dep't of Housing &
 Urban Dev. v. Rucker, 535 U.S. 125, 128-29 (2002). Furthermore, it should
 not do so without considering all of the available options. See id. at
 133-34.(FN1) Here, BHA, acting through its executive director, apparently
 believed that evicting the entire family was its only choice. Ms. Reed
 testified that she never considered any other course of action, even when
 Mr. Heaton offered to leave. She stated that BHA would not have admitted
 the family in the first place if it had known of Mr. Heaton's criminal
 record. As we noted above, however, the regulations are not so black and
 white. BHA certainly is not required to admit anyone who has a history of
 criminal activity, and such a history will be considered in evaluating an
 application. 24 C.F.R. §§ 960.202(a)(2)(iii), 960.203(c)(3). However, the
 regulations permit BHA to overlook drug history if the person is no longer
 engaging in drug abuse or has been rehabilitated. Id. § 960.204(a)(1). 
 Thus, although Ms. Reed testified that BHA would not have accepted the
 application originally if it had included Mr. Heaton's convictions, such
 testimony is somewhat speculative and self-serving based on the regulations
 as they are written.
 
 ¶ 14. The abuse of discretion in this case arose when BHA applied what
 it claims was a black and white eligibility rule five years after the
 original eligibility determination. First, as explained above, the rules
 are not inflexible. BHA could have admitted the family despite Mr.
 Heaton's criminal history. 24 C.F.R. § 960.204 (a)(1)(i). Second, the
 import of the regulations is to protect public housing from criminal
 elements, especially drug activity, that could adversely affect the
 community. The underlying community protection goals are not met by
 removing a family that has not been engaged in criminal activity during the
 five years of their tenancy. Third, federal advisory information counsels
 against the application of rigid rules in public housing because of the
 hardship that arises when tenants lose their housing. Thus, any reasonable
 approach to this problem should have included a balancing in this
 particular case of the current situation and tenant history against a
 failure to include information in the original application. In the end, it
 is still BHA's decision, but the decision must not be made arbitrarily or
 without an apparent consideration of the alternatives laid out in the
 regulations. See, e.g., 24 C.F.R. § 966.4(l)(5)(vii)(C). In affirming
 BHA's decision under an erroneous abuse-of-discretion standard, without
 examination, the trial court erred.
 
 ¶ 15. The Court recognizes that there are significant policy reasons
 for applying public housing restrictions stringently. It is important to
 keep subsidized housing as free as possible from the very real danger posed
 by crime. Furthermore, as BHA notes, the waiting list to get into public
 housing is long. For these reasons, it may have been appropriate to
 require Mr. Heaton to leave. Although the record indicates that he has not
 been involved in any criminal activity for more than a decade, the
 regulations clearly state that the housing authority has the discretion to
 evict persons who are ineligible for public housing. 24 C.F.R. §§
 966.4(l)(2)(iii)(B), (C). It is not for this Court to evaluate the wisdom
 or effectiveness of such regulations in the context of rehabilitating
 offenders. However, as discussed above, BHA failed to exercise its
 discretion in evaluating this apparently rehabilitated tenant. 

 ¶ 16. Furthermore, this decision should not be read to bar a housing
 authority from evicting a family if the head of household had intentionally
 misrepresented the criminal history of any family member on an application. 
 As BHA notes, there are many honest families in equally dire situations who
 do not resort to fraud to obtain housing. The facts in this case simply do
 not meet the necessary standards of proof, and for this reason, it was an
 abuse of discretion to evict this family.

 The trial court's decision is reversed.



 FOR THE COURT:


 _______________________________________
 Associate Justice


------------------------------------------------------------------------------
 Dissenting

 ¶ 17. BURGESS, J., dissenting. I dissent from the majority's
 reasoning and its decision to allow tenants to retain their leasehold
 despite material false statements on their application for public housing. 
 Tenants failed to disclose that Mr. Heaton was a felon and a convicted drug
 offender. The application and lease explicitly warned that such
 misrepresentations were good cause for termination of their lease. The
 trial court's conclusion that tenants knowingly submitted the false
 information to deceive BHA was not clearly erroneous, was amply supported
 by the evidence, and should be upheld. BHA's "zero tolerance" policy for
 falsified applications is not an abuse of discretion. Nor was it an abuse
 of discretion to evict tenants in response to their knowing falsehood so as
 to discourage the same dishonesty by others. Accordingly, I would affirm
 the trial court's judgment. 

 ¶ 18. So anxious appears the majority to take over the reins of BHA to
 change the result in this unfortunate situation, that it abandons the
 presumption of reasonableness and validity usually accorded agency
 decisions reached within the agency's expertise. In re Capital Inv., Inc.,
 150 Vt. 478, 480, 554 A.2d 662, 665 (1988). Ordinarily we require a clear
 and convincing showing to overcome that presumption, and do not overturn an
 agency's decision if there is any reasonable basis to support its actions. 
 Id. There is no such showing here. That the majority might have responded
 differently does not mean that BHA, or the trial court, abused its
 discretion in reaching an opposite result. See, e.g., In re L.R.R., 143
 Vt. 560, 562, 469 A.2d 1173, 1175 (1983) (discretionary ruling will not be
 set aside "simply because a different result might have been supportable,
 or because another court might have reached a different conclusion"). 
 
 ¶ 19. It was no abuse of discretion for BHA to do what the parties
 agree it was plainly authorized by law to do. It is senseless, and not for
 the Court, to make BHA balance the merits between evicting tenants who
 falsify their housing application and allowing them to stay for the sake of
 their children, when either result is entirely within the agency's
 discretion. It is no less strange for the majority to impose judicial
 review over BHA's discretionary decisions when whatever decision it reaches
 within its discretion - to evict or not to evict for fraud - is authorized
 by law. The issue is not, as the majority posits, that tenants have been
 well-behaved since moving in, but whether BHA can evict them for lying
 about felonies and drug offenses on their housing application. The
 regulations make clear that screening applicants is crucial "to public
 housing communities and program integrity, and the demand for assisted
 housing by families who will adhere to lease responsibilities." 24 C.F.R.
 § 960.203(b) (2006). Requiring applicants to be truthful on their housing
 applications serves these goals, and those who are not truthful may clearly
 be expelled. Id. § 966.4(l)(2)(iii)(B), (C) (stating that "good cause" for
 eviction includes a housing authority's discovery of tenant ineligibility,
 or discovery of a material false statement in a tenant's application). 
 Just as clearly, BHA may, like any landlord, choose to allow dishonest
 applicants to stay. Examination by the courts of such determinations is
 not judicial review, but is just second-guessing.

 ¶ 20. The record reflects that on their housing application, tenants
 represented that neither had been charged with a felony nor charged with
 the sale, distribution, or possession of illegal drugs.(FN2) They
 certified that: 

 ALL INFORMATION IN THE APPLICATION IS TRUE TO THE BEST OF MY/OUR
 KNOWLEDGE AND I/WE UNDERSTAND THAT FALSE STATEMENTS OR OTHER
 INFORMATION . . . WILL LEAD TO CANCELLATION OF THE APPLICATION OR
 TERMINATION OF TENANCY AFTER OCCUPANCY.

 One month later, tenants signed a lease agreement with BHA which provided
 that BHA could terminate or refuse to renew the lease for good cause, and
 specified, under the heading of "Misrepresentation," that:

 In the event tenant misrepresents facts or information to
 management during the application, investigation, and tenant
 selection period prior to the execution of this lease or
 subsequent thereto, said misrepresentation(s) shall constitute
 good cause for termination of this lease.

 BHA's check for a criminal record in Vermont turned up nothing. Later, an
 updated record check in New York revealed that, contrary to the
 representations on the application, Mr. Heaton had two felony convictions
 in New York State, one for attempted burglary and one for sale of a
 controlled substance.
 
 ¶ 21. The executive director of BHA issued a termination notice to the
 tenants, explaining that their lease would be terminated for
 "misrepresentation" and "knowingly supplying false, incomplete, or
 inaccurate information" about Mr. Heaton's criminal record on their
 application. Before termination and in accordance with the process due
 under the lease and the housing regulations, the executive director
 conferred with the tenants to afford them an opportunity to respond to the
 notice. At the conference, according to the executive director's
 testimony, Mr. Heaton responded that he did not have any convictions in
 Vermont, and Ms. Bush claimed she did not know any specifics of Mr.
 Heaton's criminal record. In a post-conference letter confirming the
 director's decision to terminate, tenants were advised of their right to a
 pre-termination hearing, which they declined, and the subsequent eviction
 action alleging fraud (FN3) was filed and proceeded to trial.

 ¶ 22. The majority attacks the trial court's decision on two fronts: 
 for failing to comport with the majority's notion of merit, and for failing
 to share the majority's misconception of the discretion owed the tenants by
 BHA. The majority declares the judgment in favor of BHA on eviction for
 fraud unsupported by the evidence, while ignoring the trial court's
 determination of credibility, and without applying any discernible standard
 of review. Next, the trial court is faulted for reversible error in
 "affirming . . . without examination" BHA's decision to terminate the
 lease, ante, ¶ 14, despite the court's examination of BHA's action in view
 of the housing authority's rights and obligations to the tenants under the
 lease and the discretion claimed due by the tenants.

 ¶ 23. Starting with the judgment of eviction for fraud, the trial
 court's decision was well-supported within our established standard of
 review. BHA's burden was to prove the fraud by clear and convincing
 evidence, but 
 
 [d]espite the heightened burden of proof . . . , the standard of
 review in this context remains deferential: The test on review is
 not whether this Court is persuaded that there was clear and
 convincing evidence, but whether the factfinder could reasonably
 have concluded that the required factual predicate was highly
 probable. Only where the record indicates that the trial court
 clearly erred in finding clear and convincing evidence will this
 Court reverse such a finding. 

 In re E.T., 2004 VT 111, ¶ 13, 177 Vt. 405, 865 A.2d 416 (citations omitted
 and emphasis added). 

 ¶ 24. The trial court's conclusion that tenants defrauded BHA by
 knowingly submitting false information on their housing application was
 not clearly erroneous. Mr. Heaton admitted the convictions after their
 discovery by BHA. As to Ms. Bush, the trial court found that she knew her
 misrepresentation - that Mr. Heaton had no felony or drug convictions - was
 false when she filled out the application. While not stated by the court,
 this necessarily and obviously means that the trial court found Ms. Bush
 incredible in her assertion of ignorance that her partner's criminal record
 included felonies and drug offenses. "As the trier of fact, it was the
 province of the trial court to determine the credibility of the witnesses
 and weigh the persuasiveness of the evidence." Cabot v. Cabot, 166 Vt.
 485, 497, 697 A.2d 644, 652 (1997). 
 
 ¶ 25. This was strictly a swearing contest. On the one hand, Ms. Bush
 testified that, while knowing Mr. Heaton had a criminal past and spent six
 years in prison, and sharing her household and the company of her
 thirteen-year-old daughter with him, she did not know and did not want to
 know about Mr. Heaton's record. Ms. Bush also testified that she was not
 inclined to disclose her partner's "past" to BHA, because "they were doing
 a background check on us anyway so I figured whatever they were going to
 find out, they were going to find out." At a minimum, then, the court knew
 that Ms. Bush was simply taking her chances that the background check would
 not reveal a felony or drug conviction. This lack of forthrightness,
 combined with the not-altogether-likely proposition that Ms. Bush lived
 with and exposed her daughter to a six-year-imprisoned criminal without
 being curious about the nature of the man's record, would not appear to
 compel a reasonable finder of fact to assume Ms. Bush was telling the
 truth. On the other hand, as noted by the trial court, the tenants were
 made desperate by their homelessness and the impending birth of triplets,
 and knew that disclosing a felony or drug record would disqualify them from
 BHA housing.

 ¶ 26. The trial court did not believe Ms. Bush and need not explain its
 disbelief. State v. Hagan, 151 Vt. 64, 65, 557 A.2d 493, 494 (1989)
 (finding "no support in Vermont law" for argument that the trial court's
 conclusion that a witness was incredible must be accompanied by "some
 finding showing the reasoning of the court in rejecting the testimony, or
 some other support in the record"). "It is axiomatic in this state that
 the trier of fact is given the sole determination of the . . . credibility
 of witnesses, and the persuasive effect of the testimony." Id. (explaining
 that this Court does not ordinarily review credibility determinations
 "[g]iven the inherent difficulty in evaluating demeanor, mannerisms, and
 tone of voice, in addition to the quality of the testimony itself," and
 that this Court has never applied an evidentiary test for the finding of
 witness credibility since such determination turns on intangibles and the
 "judge's discretion and experience and is rarely reducible to a precise
 formula").(FN4)
 
 ¶ 27. The trial court's conclusion - that to argue Ms. Bush's "failures
 to disclose were not made with fraudulent intent would fly in the face of
 the evidence and common sense" - was supported by the evidence. Having
 concluded that Ms. Bush knowingly falsified her application, the court then
 knew that her misrepresentation was false and known to be false when made. 
 The court also knew that the misrepresentation was made in response to a
 question about felony and drug convictions prominently included on the
 application. Further, the court's finding that Ms. Bush was desperate for
 BHA housing was entirely supported by the evidence. Given her desperation
 and that she deliberately gave a false answer to a prominent question, the
 trial court could reasonably conclude, as it did, that it was highly
 probable that Ms. Bush meant the falsehood to be relied upon by the housing
 authority. The executive director testified, and the trial court found,
 that had Ms. Bush answered honestly about Mr. Heaton's felony and drug
 convictions, their application would have been turned down. Thus it was
 highly probable, if not certain, that the misrepresentation was relied upon
 by BHA. It cannot be said that the trial court was clearly erroneous in
 its conclusion that BHA proved the fraud underlying its eviction.

 ¶ 28. The majority is further mistaken in its conclusion that the trial
 court was without evidence of damage when it was undisputed that tenants
 would not have been offered a lease but for their falsification of the
 housing application.(FN5) However intangible, BHA's damage was the loss
 of its right to make an informed decision based on a truthful application,
 and its right under the regulations to exclude burglars and drug dealers
 from its housing project. See 24 C.F.R. § 960.203(c)(3), (d) (authorizing
 housing authorities to exclude applicants with a history of criminal acts
 that "would adversely affect the health, safety or welfare of other
 tenants" considering the "time, nature and . . . seriousness of the
 offense"). Analogizing, as we must, to damages for fraud in the context of
 this eviction action, the damage sought to be remedied was the return of
 the leasehold dishonestly obtained by these tenants. See Larochelle v.
 Komery, 128 Vt. 262, 268, 261 A.2d 29, 33 (1970) (observing that the
 purpose of damages in a tort action for fraud is to return the injured
 party to "the same position that he would have occupied had he not been
 defrauded"). The record evidence was quite sufficient for the trial court
 to reasonably conclude that it was highly probable that BHA was fooled into
 granting tenants a leasehold that it otherwise would not have conveyed.
 
 ¶ 29. Similarly, the majority is in error when it says that because BHA
 had the ability to discover the falsehood through criminal record checks,
 there was no evidence that the misrepresentation "was not open to the
 defrauded party's knowledge" as necessary for common-law fraud. Union
 Bank v. Jones, 138 Vt. 115, 121, 411 A.2d 1338, 1342 (1980). The testimony
 was that BHA did not have the ability to computer-check records beyond
 Vermont until some time after the application, and that the director did
 not know of the record until she checked New York records in connection
 with an unrelated complaint. Assuming that BHA could have run a more
 exhaustive check at the time of application, it is long-settled that "when
 the essential elements of a fraudulent representation are established, it
 is no excuse for the defendant, nor does it lie in [her] mouth to say, that
 the plaintiff might, but for his own neglect, have discovered the wrong and
 prevented its accomplishment." Arnold v. Somers, 92 Vt. 512, 520-21, 105
 A. 260, 263 (1918). On this record the majority cannot seriously maintain
 that it was not highly probable that BHA was ignorant of Mr. Heaton's
 record when it was misrepresented on the application by Ms. Bush, or that
 the trial court was clearly erroneous in so concluding. 
 
 ¶ 30. If, as the majority says, the trial court applied the wrong
 standard for abuse of discretion in its review of BHA's termination of the
 lease, it was harmless error. Even under the majority's definition, the
 reason given for BHA's policy to terminate its leases with tenants caught
 lying on their applications, rather than tolerate such dishonesty, was not
 so "untenable or unreasonable" as to be an abuse of discretion. Herald
 Ass'n v. Dean, 174 Vt. 350, 360, 816 A.2d 469, 478 (2002). The majority is
 simply incorrect when it says that BHA "applied what it claims was a
 black-and-white eligibility rule five years after the original eligibility
 determination." Ante, ¶ 14. BHA made no such claim. As the executive
 director testified, the notice to the tenants stated, and the trial court
 found, BHA based its action not on ineligibility as of the time tenants
 applied for housing, but on a firm policy of lease termination if tenants
 falsified material information on their application.(FN6) BHA's rationale
 of zero tolerance for application falsification - to promote candid
 disclosure and to discourage dishonesty - may be strict, but it is no abuse
 of discretion.

 ¶ 31. Moreover, the policy described by BHA and found by the trial
 court is expressly approved in the federal housing regulation 24 C.F.R. §
 966.4(l)(2)(iii)(B), (C), which specifically provides that "good cause" for
 termination includes "[d]iscovery after admission [to the project] of facts
 that made the tenant ineligible," and "[d]iscovery of material false
 statements . . . by the tenant in connection with an application." Having
 discovered tenants' material falsehood on the application, good cause for
 termination was established under the regulation and, once established, no
 regulation obligated BHA to then balance mitigating circumstances against
 termination. 
 
 ¶ 32. While agreeing that the regulations clearly vested BHA with
 discretion in dealing with violations, the majority then misconstrues the
 regulations to impose some obligation on BHA to consider all options short
 of evicting the entire family. It should be reiterated here what this case
 is, and is not, about. We are not called upon to rule on what discretion
 must, or need not be, exercised by BHA when confronted with criminal
 activities by some, but not all, members of a tenant household. The only
 issue before this Court is whether BHA can terminate the lease of tenants
 who falsify material information on their housing application. Here, BHA
 was committed to evicting the entire family, not just because the father
 lied on the application, but because the mother lied also. 

 ¶ 33. Contrary to the majority's construction, the federal regulations
 do not require a public housing authority to engage in a balancing process
 before deciding to terminate a tenancy. The regulations provide that BHA
 may terminate a tenancy at any time in accordance with 24 C.F.R. §
 966.4(l). 24 C.F.R. § 966.4(a)(2)(iii). Section 966.4(l) lists several
 "[g]rounds for termination of tenancy." Id. § 966.4(l)(1)-(2). Among them
 is "good cause," including the discovery of disqualifying facts or
 application falsehoods mentioned earlier. Id. § 966.4(l)(2)(iii)(B), (C). 
 The regulations state that housing authorities "may" also consider
 mitigating circumstances in deciding to evict, see id. §
 966.4(l)(5)(vii)(A)-(E), but these provisions apply only to evictions based
 on then-current criminal activity as described in preceding sections of the
 rule. See id. § 966.4(l)(5)(i) ("[e]victing drug criminals"), (ii)
 ("[e]victing other criminals"), (iii) ("[e]viction for criminal activity"). 
 While the rules cited by the majority are inapposite to this case, it is
 nevertheless noteworthy that even the eviction-for-criminal-activity
 regulations do not require, but merely permit, a public housing authority
 to engage in a balancing process before terminating a lease. See id. §
 966.4(a)(2)(iii); id. § 996.4(l)(5)(vii)(B). See also Burton v. Tampa
 Housing Auth., 171 F. Supp. 2d 1314, 1317 (M.D. Fla. 2000) (holding that,
 although federal regulations "authorize public housing agencies to make
 eviction decisions on a case-by-case basis, they do not mandate such
 discretionary review"). As the Burton court noted, this conclusion is
 consistent with the general policy of the Public Housing Act, which is "to
 give local public housing authorities the maximum amount of responsibility
 in the administration of their programs." Id.(FN7) 

 ¶ 34. It appears that the majority stands for a proposition that an
 agency granted discretionary authority to deal with general situations is
 nevertheless prohibited from adopting and following a policy prescribing
 certain results within that broad discretion, because the policy is not
 mandated. Instead, the proposition continues, the agency must address each
 individual situation as it arises, lest it not use the breadth of its
 discretion each time, although the exercise of discretion is not mandated
 either. So, here the regulations say that falsification of a housing
 application is good cause for termination, but they do not mandate that
 result, while other regulations also authorize, but also do not mandate,
 that the housing authority "may" consider mitigation before evicting for
 criminal activity. Thus, the majority reasons, it is an abuse of its
 available discretion for BHA to refuse to consider mitigation instead of
 following its policy to evict for falsification based on the regulatory
 definition of good cause for termination. 
 
 ¶ 35. There are several flaws in this logic. The first is that nowhere
 does it appears that tenants are entitled to the exercise of discretion
 they claim. It is certainly not in their lease, which says quite the
 opposite, and it is not in the regulations cited. No regulation requires
 BHA to consider or balance other circumstances as precondition to either
 termination or to allow a tenant to stay. Second, the same lack of
 regulatory obligation undermines the majority's premise that BHA just
 simply must exercise more discretion, because the option to consider
 mitigation at all is itself purely discretionary. Under the regulations,
 BHA is entirely free to elect not to consider discretionary balancing. 
 Third, reading the regulations to somehow mandate discretionary balancing
 nullifies the "good cause for termination" expressly recognized and spelled
 out in the plain language of the regulation. 24 C.F.R. §
 966.4(l)(2)(iii)(B), (C).(FN8)
 
 ¶ 36. Finally, the whole issue of "abuse of discretion" by BHA appears
 to be improperly before this Court. Pleaded as an "affirmative defense" to
 the eviction action, tenants essentially challenged the underlying
 administrative action by BHA to terminate the lease under the regulations. 
 BHA is a creature of the state, "or a political subdivision thereof," for
 purposes of review of governmental action under V.R.C.P. 75(a). See 24
 V.S.A. §§ 4001-4008 (declaring formation of local housing authorities as
 "public bod[ies], corporate and politic, exercising public and essential
 governmental functions" necessary to fund, build and administer public
 housing). In many ways, tenants' claim of abuse of discretion resembles,
 and might have been framed as, a petition or counterclaim for review of
 governmental action, or for injunctive or declaratory relief. However
 pleaded, the matter was not for the trial court to decide because tenants
 failed even to initiate, let alone exhaust, their administrative remedies. 

 ¶ 37. Before and after their informal conference with the director,
 tenants were notified of their right to a hearing under the BHA grievance
 procedure. The right to a fairly elaborate hearing process is established
 by the regulations, see 24 C.F.R. §§ 966.52-.57, which include a provision
 that:

 At the hearing, the complainant must first make a showing of an
 entitlement to the relief sought and thereafter the [public
 housing authority] must sustain the burden of justifying the
 [authority's] action or failure to act against which the complaint
 is directed.

 Id. § 966.56(e). Whether BHA was unreasonable in its administration or
 legally incorrect in its construction of the regulations was properly
 subject to the grievance procedure. Tenants, however, did not pursue a
 grievance.(FN9) We have often held that "when an administrative remedy is
 established by statute or regulation, relief must not only be sought in
 accordance therewith, but must first be exhausted before recourse to the
 courts is available." In re D.A. Assocs., 150 Vt. 18, 20, 547 A.2d 1325,
 1326 (1988). The question of abuse of discretion by BHA should be treated
 as waived, for the encouragement of others, and not entertained here.

 ¶ 38. The trial court's decision should be affirmed. I am authorized
 to state that Justice Dooley joins in this dissent.



 _____________________________________
 Associate Justice


------------------------------------------------------------------------------
 Dissenting


 ¶ 39. DOOLEY, J., dissenting. I join the dissent in this case, but
 write separately to make three points about the context, the facts
 supporting the superior court's action, and the applicable law. 

 ¶ 40. First, the context. The actions of BHA in this case reflect the
 enforcement of a national policy to protect the safety of tenants of public
 housing. The policy was announced by President William Clinton in his
 State of the Union Address in 1996, 1996 WL 23253 (Jan. 24, 1996), and in
 his remarks at a One Strike Crime Symposium later in that year, see 1996 WL
 139526 (March 28, 1996). The policy was based on giving public housing
 tenants "a better deal than they have gotten in the past." Id. at *2.

 This policy today is a clear signal to drug dealers and to gangs:
 If you break the law, you no[] longer have a home in public
 housing. One strike and you're out. That should be the law
 everywhere in America.

 To implement this rule, we are taking two steps. First, I will
 direct Secretary Cisneros to issue guidelines to public housing
 and law enforcement officials to spell out with unmistakable
 clarity how to enforce one strike and you're out. These
 guidelines are essential.

 Believe it or not, the federal law has actually authorized one
 strike eviction since 1988. But many public housing authorities
 have not understood the scope of their legal authority. Others
 have problems working with residents or local police or the
 courts. And for a small number, enforcement has, frankly, not
 been a priority. For whatever reason, the sad fact is that in
 most places in this country, one strike has not been carried out.
 . . .

 Now there will be no more excuses, for those national guidelines
 tell public housing authorities the steps they must take to evict
 drug dealers and other criminals. They explain how housing
 authorities must work with tenants, with the police, with the
 courts [and] with our government to get the job d[one]. They also
 tell housing authorities how to screen tenants for criminal
 records. With effective screening, many of the bad people we're
 trying hard to remove today won't get into public housing in the
 first place.

 The second thing we're going to do is to make sure these
 guidelines don't sit around and gather dust. Under the new rules
 HUD will propose, for the first time there will actually be
 penalties for housing projects that do not fight crime and enforce
 one strike and you're out.

 Id. (emphasis added). HUD reiterated the national policy through a policy
 directive. See Directive 96-16, " 'One Strike and You're Out' Screening
 and Eviction Guidelines for Public Housing Authorities" (April 12, 1996),
 http://www.hudclips.org/ (follow "library" hyperlink; then select "Public
 and Indian Housing" under "Notices"; then enter 96-16 under "Document
 number"). 

 ¶ 41. BHA implemented the national policy directive, in part, by
 adopting a one strike, or zero tolerance, rule for applicants who lie on
 the housing application. This decision shows that BHA is caught in a
 conflict between implementing national policy on which its funding can be
 based and a majority of this Court which is obviously unsupportive of the
 national policy or its implementation.
 
 ¶ 42. Second, and despite the decision of the majority, this is not a
 close case on the facts. The application misrepresentations go to the
 heart of the policy on keeping public housing projects free of criminal
 conduct, particularly drug sales, and the evidence of the
 misrepresentations is overwhelming. This is not a case where tenants are
 being evicted for incidental and unimportant misrepresentations, or on weak
 evidence.

 ¶ 43. It is undisputed that Scott Heaton spent six years in prison in
 New York for felony offenses that involved burglary and selling drugs and
 also was found guilty of lesser criminal offenses in that state. Yet, he
 signed and certified a public housing application that said he had never
 been charged with a felony and had never been charged with the sale,
 distribution or possession of illegal drugs. As quoted above, the
 application form stated that tenants "CERTIF[IED] THAT ALL INFORMATION IN
 THE APPLICATION [WAS] TRUE TO THE BEST OF [THEIR] KNOWLEDGE" and that they
 "UNDERST[OOD] THAT FALSE STATEMENTS OR OTHER INFORMATION [WERE] PUNISHABLE
 BY LAW AND [WOULD] LEAD TO CANCELLATION OF THE APPLICATION OR TERMINATION
 OF [THE] TENANCY AFTER OCCUPANCY."

 ¶ 44. The case here was open-and-shut as to Mr. Heaton, but virtually
 without explanation of his circumstances, the majority reverses his
 eviction on the basis that there is no evidence of intent to misrepresent. 
 Apparently, the majority accepts as a defense that Mr. Heaton signed
 without reading the application and thus, is innocent of any
 misrepresentation, a result that simply eliminates any obligation to be
 truthful.
 
 ¶ 45. The situation is only marginally better with respect to Ms. Bush. 
 Assuming what she knew about Mr. Heaton's circumstances is relevant, an
 assumption I do not accept given Mr. Heaton's misrepresentation, the
 majority holds that as a matter of law the trial court must accept her
 statement that she knew Mr. Heaton spent six years in jail, but did not
 know the grounds for the imprisonment or that he had been charged with a
 felony. Without expecting that Ms. Bush fully understands the technical
 distinction between felonies and misdemeanors, it could escape no one that
 a six-year sentence could be imposed only for serious crimes. I would join
 the trial judge in finding Ms. Bush's explanation not worthy of belief. Of
 course, my evaluation of the credibility of Ms. Bush is irrelevant, just as
 it should be also for the majority.

 ¶ 46. My characterization of the closeness of this case applies equally
 to the majority's conclusion that BHA did not rely on the information
 provided by the tenants as a matter of law. Based on the evidence from the
 director of BHA, the court specifically found that BHA would not have
 admitted the tenants if it had known of Mr. Heaton's New York criminal
 record, and that the only information BHA had concerning criminal
 convictions from other states came from the tenants. Moreover, the court
 found that the application answers "were meant to be relied on by the
 injured party." Thus the majority's statement that "BHA did not rely on
 the information provided by Ms. Bush," ante, ¶ 11, is plainly contradicted
 by the evidence and the findings based on that evidence. The majority's
 final statement on this point - that the fact "that BHA did not run a more
 extensive record check does not . . . prove an intent to defraud" - both
 understates the finding that BHA did not have the technological capacity to
 search criminal records beyond Vermont and confuses reliance with intent to
 defraud, a wholly different element. 

 ¶ 47. Finally, the facts are presented as if BHA can evict only if both
 tenants personally participated in the misrepresentations, or at least if
 the "head of household" participated in the misrepresentation. I think the
 evidence is overwhelming that both tenants did, but I find nothing in the
 policies of BHA or the HUD rules on application or eviction that suggest
 that Ms. Bush's lack of knowledge is a defense when Mr. Heaton had the
 requisite knowledge and falsely certified the accuracy of his application
 with respect to his criminal history. The designation of "head of
 household" apparently reflects only that Ms. Bush was present to fill out
 the form, and no rule or guideline suggests that the representations of a
 co-applicant who will live in the unit are less important than those of the
 "head of household." 
 
 ¶ 48. On a related point, nothing in the rules or policies suggest that
 BHA can evict only the person who made the misrepresentation, leaving the
 other family members in place. The fact that the tenants offered such a
 solution to settle the dispute does not mean there is any legal obligation
 for BHA to accept it. There are many practical reasons why BHA would not
 accept such a settlement, not the least of which would be the practical
 impossibility of keeping Mr. Heaton off the premises where his children and
 partner reside. 

 ¶ 49. Third, I don't agree that a zero tolerance policy on some issues
 is inconsistent with HUD regulations and guidelines. Indeed, as the
 context demonstrates, such a policy represents the desired implementation
 of HUD guidelines if used carefully and sparingly. This issue is analyzed
 in Justice Burgess's dissent, which I join. I note also that HUD stated in
 its directive on this policy that "current law permits local housing
 agencies to adopt One Strike policies ." HUD Directive 96-16 at 1. As
 discussed above, the one-strike policy involves "Tougher Screening." Id.
 at 4. It also involves adoption of zero tolerance policies with respect to
 certain offenses. See, e.g., id. at 6 (stating that leases should express
 zero tolerance policy with respect to criminal activity).

 ¶ 50. In this case, BHA announced its zero tolerance policy through its
 application, which stated that "FALSE STATEMENTS [IN THE APPLICATION] . . .
 WILL LEAD TO CANCELLATION OF THE APPLICATION OR TERMINATION OF TENANCY
 AFTER OCCUPANCY." Misrepresentation by nondisclosure of criminal
 convictions and charges is an appropriate situation for a zero tolerance
 policy. It indicates an unwillingness to deal fairly and openly with the
 housing authority and restricts the ability of the housing authority to
 make appropriate eligibility determinations to protect existing tenants.
 
 ¶ 51. Even if I agreed that a zero tolerance policy was unlawful, I
 could not agree that BHA failed to exercise in this case exactly the
 discretion the majority seeks. In response to the question of whether BHA
 considered "the circumstances surrounding their tenancy," the BHA director
 answered that BHA had "some issues" with the tenants in the past and had
 served them with two termination notices and that there had been a domestic
 violence incident. Indeed, tenants' conduct led BHA to do a national
 record check on them when the capacity to do so became available.

 ¶ 52. The majority is essentially warring with BHA's adoption of a
 national policy to make public housing projects safe and secure for
 residents by screening out those with criminal backgrounds. Whatever our
 view of this national policy, it is our duty to enforce the law through
 which it has been implemented, rather than our policy preference. The
 majority fails to discharge that duty. 




 _______________________________________
 Associate Justice



------------------------------------------------------------------------------
 Footnotes


FN1. The regulations set out numerous circumstances in which the housing
 authority "may" terminate a lease, but only a very few circumstances in
 which it "must" terminate a lease. See, e.g., 24 C.F.R. § 966.4(l)(2)
 ("The PHA may terminate the tenancy only for: . . . (iii) Other good cause
 includ[ing] but . . . not limited to the following: . . . (B) Discovery
 after admission of facts that made the tenant ineligible."); id. §
 966.4(l)(5)(i)(B) ("In addition, the lease must provide that a PHA may
 evict a family when the PHA determines that a household member is illegally
 using a drug . . ."). But see id. § 966.4(l)(5)(i)(A) ("The PHA must
 immediately terminate the tenancy if the PHA determines that any member of
 the household has ever been convicted of drug-related criminal activity for
 manufacture or production of methamphetamine on the premises of federally
 assisted housing.").

 In addition, the regulations list certain things the housing authority
 may consider when deciding how to act.

 (B) . . . [T]he PHA may consider all circumstances relevant to a
 particular case such as the seriousness of the offending action,
 the extent of participation by the leaseholder in the offending
 action, the effects that the eviction would have on family members
 not involved in the offending activity and the extent to which the
 leaseholder has shown personal responsibility and has taken all
 reasonable steps to prevent or mitigate the offending action.

 (C) . . . The PHA may require a tenant to exclude a household
 member in order to continue to reside in the assisted unit, where
 that household member has participated in or been culpable for
 action or failure to act that warrants termination.

 Id. § 966.4(l)(5)(vii) (B), (C).

FN2. The record does not show, as the majority suggests, that Ms. Bush
 understood these questions to apply only to her as "head of household." 
 See ante, ¶ 9. In fact, Ms. Bush testified to exactly the opposite
 effect, acknowledging she needed to get Mr. Heaton's signature on the
 application and explaining that she filled out the form truthfully "as far
 as [she] knew" at that time, because "we [(referring to herself and Mr.
 Heaton)] had discussed a past; we never got into felonies or anything like
 that. We had discussed his past." Clearly Ms. Bush knew she answered the
 questionnaire on behalf of Mr. Heaton, coincidentally identified as
 "co-applicant" on the form, as well as for herself. Not claiming she
 answered only for herself, Ms. Bush instead claimed ignorance of the
 "specifics" of Mr. Heaton's record, including the felony and drug offenses
 - although she was aware he had a "past" that involved a six-year jail
 stint.

FN3. Although the terms of the application and lease, and the regulation at
 24 C.F.R. § 966.4(l)(2)(B), (C), provide for eviction on the submission of
 false material information alone, regardless of the applicant's knowledge
 or fraudulent intent, BHA nevertheless claimed fraud in its complaint and
 tenants insisted that the trial court treat it as an action for common-law
 fraud. The case will be addressed as pleaded.

FN4. The majority's review and evaluation of Ms. Bush's testimony is
 directly at odds with our long-established precedent not to second-guess
 trial court credibility determinations. Our function is "not to reweigh
 evidence or to make finding of credibility de novo." Mullin v. Phelps, 162
 Vt. 250, 261, 647 A.2d 714, 720 (1994). The reason for this is
 well-illustrated by the majority's conclusion that Ms. Bush's protestations
 of ignorance were not incredible based upon an interpretation of her
 testimony that she answered the questionnaire only for herself, and that it
 was illogical for her to falsify when she knew her answers would be checked
 by BHA. Both premises are wrong, for the record plainly indicates that,
 taking her testimony in context, Ms. Bush was indeed referring to her
 co-tenant's "past" when filling out the application, and that, already
 homeless with nothing to lose, she simply took her chances on the record
 check (a good gamble, as it turned out, since the check failed to reveal
 the disqualifying out-of-state felonies and drug convictions).

FN5. The majority curiously assumes the mantle of the trial court to
 characterize the executive director's testimony in this regard as "somewhat
 speculative and self-serving." Ante, ¶ 13. Such assessments are properly
 left to the judge who hears the evidence and, as accepted by the trial
 judge, this testimony appeared to be neither uncertain nor convenient. The
 witness' statement was entirely consistent with the written BHA policies
 admitted into evidence in connection with her testimony, as well as with
 the governing federal regulations. Moreover, this aspect of her testimony
 was never challenged in any sense on cross-examination, and was found by
 the trial court as fact.

FN6. Asked if BHA could overlook misrepresentations on applications for
 admission to public housing, the executive director answered "No, we can't
 because then other people that are coming in and other tenants in the
 complex say they got away with it, so we can do it, too." Later, on
 cross-examination, the director agreed she considered no other option but
 termination "because they weren't honest with me in the beginning."

FN7. Dep't of Housing & Urban Dev. v. Rucker, 535 U.S. 125 (2002), cited by
 the majority at ante, ¶ 13, says nothing to the contrary. Rucker does not
 hold that public housing authorities must exercise discretion to consider
 other options before terminating a public housing tenancy. Rather, in
 Rucker, the United States Supreme Court held that, under federal law,
 public housing lease agreements must include a clause that gives the
 housing authorities discretion to terminate a lease when a member or guest
 of the tenant's household engages in drug-related activity, regardless of
 the tenant's ignorance of that activity. The Court confirmed that eviction
 was not required, but that the law entrusted that decision to the local
 housing authorities. Id. at 133-34. The Court found nothing unreasonable,
 however, in allowing "no fault" eviction of a tenant on account of drug
 activities by a household member, finding such eviction to be "a common
 incident of tenant responsibility under normal landlord-tenant law and
 practice." Id. at 134 (citation omitted). As the Court explained
 "[s]trict liability maximizes deterrence and eases enforcement
 difficulties." Id. Rucker does not support the majority's analysis; it
 merely emphasizes the broad discretion afforded a public housing authority
 in administering its operations.

FN8. The majority's construction would convert "good cause for termination"
 into something less, like "almost good cause," "not quite good cause," or
 "good cause to start talking about termination." This is not what the
 regulation says.

FN9. Tenants acknowledged the existence of the grievance procedure in their
 proposed findings filed prior to trial. On appeal, tenants complained
 that notice of the grievance procedure was deficient, but this issue was
 never raised before the trial court and so was not preserved.