NOTICE:  This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports.  Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2021 VT 33

No. 2020-110

| | |
|---|---|
| U.S. Right to Know | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Chittenden Unit, |
| | Civil Division |
| | |
| University of Vermont | September Term, 2020 |

Helen M. Toor, J.

Stephen F. Coteus and Ronald A. Shems of Tarrant, Gillies, Richardson & Shems, Montpelier, for Plaintiff-Appellant.

Sharon Reich Paulsen, Vice President and General Counsel, and Meghan E. Siket, Associate General Counsel, Office of General Counsel University of Vermont, Burlington, for Defendant-Appellee.

PRESENT:  Reiber, C.J., Robinson, Eaton, Carroll and Cohen, JJ.

¶ 1.  **COHEN, J.**   In this Public Records Act (PRA) case we are asked to determine whether emails on a university's server sent between a professor and third-party entities, and concerning the work of those entities, qualify as "public records" subject to public inspection.  U.S. Right to Know (USRTK) appeals from the superior court's grant of summary judgment in favor of the University of Vermont (UVM) after the court held that the emails USRTK requested from UVM are not public records.  We agree that the emails at issue are not public records and accordingly affirm.

¶ 2.    The following facts are uncontested.  Professor Naomi Fukagawa is a retired professor of UVM's Larner College of Medicine who has served as an editor of two peer-reviewed academic journals—Nutrition Reviews and the American Journal of Clinical Nutrition.  Dr. Fukagawa has also served on two advisory committees associated with the U.S. government and the University of Illinois at Urbana-Champaign.  Although the journals and committees are not affiliated with UVM, before and after her retirement, Dr. Fukagawa used her UVM email account to correspond with individuals affiliated with the journals and committees.

¶ 3.    In March 2018, USRTK, a nonprofit public-health research organization, made a PRA request to UVM, seeking emails on UVM's server between Professor Fukagawa and named persons associated with the journals and committees during a specified timeframe.  UVM's search returned 10,140 potentially responsive emails.  The parties agree that the emails are "almost exclusively related" to Dr. Fukagawa's editorial roles on the journals and her work on the committees.  USRTK is clear that it is seeking Professor Fukagawa's emails related to her work on the journals and committees, not other emails caught in the requested search parameters.

¶ 4.    In March 2019, UVM responded to the records request, asserting that the emails are not "public records" subject to disclosure under the PRA because the journals and committees are not affiliated with UVM and Professor Fukagawa corresponded with these entities in her personal capacity.  Following an unsuccessful appeal to UVM's president and an ineffective amended request expanding the timeframe of requested emails, USRTK filed suit in the superior court to compel disclosure.

¶ 5.    The superior court granted UVM's motion for summary judgment, ruling that the emails are not public records because they were not "produced or acquired in the course of public agency business."  See 1 V.S.A. § 317(b) (defining "public record").  The court observed that the purpose of the PRA is to ensure that the public can review and criticize government—not private—

2

action. Finding that the emails played no role in the University's business, the court concluded that there was no government role at issue in need of public inspection.

¶ 6. On appeal, USRTK first argues that UVM bears the burden of proof to support its action of withholding the emails, a burden USRTK claims has not been met. USRTK then advances several premises in support of its argument that the emails are public records. First, it observes that the emails were sent using the University's email system. Second, it argues that the professor was acting within the scope of her employment, which it equates with "in the course of public agency business," because (a) UVM's email policy requires employees to use their UVM email account exclusively for UVM business, except for "occasional and incidental non-University matters," and (b) UVM benefits from, encourages, expects, promotes—and spends public funds promoting—the professor's work on such journals and committees.

¶ 7. This Court reviews a decision granting summary judgment without deference and applies the same standard as the superior court. Wesco, Inc. v. Sorrell, 2004 VT 102, ¶ 9, 177 Vt. 287, 865 A.2d 350. A grant of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." V.R.C.P. 56(a).

¶ 8. The PRA seeks to provide the people a means of examining public records so they may review and criticize the actions of their government. See 1 V.S.A. § 315(a). To that end, the Act provides that "[a]ny person may inspect or copy any public record of a public agency." Id. § 316(a). "Public record" is defined as "any written or recorded information, regardless of physical form or characteristics, which is produced or acquired in the course of public agency business." Id. § 317(b). Certain public records are nevertheless exempted from public inspection for a host of reasons, such as confidentiality and privilege. See id. § 317(c). A person aggrieved by the denial of a request for public records may pursue relief in court, where the agency bears the burden of proof to sustain its action. Id. § 319(a).

3

¶ 9.    As an initial matter, there is nothing for us to add here regarding the burden of proof.  See Trombley v. Bellows Falls Union High Sch. Dist. No. 27, 160 Vt. 101, 107, 624 A.2d 857, 861 (1993) ("In a dispute over access in the trial court, the burden is on the agency to sustain its action." (citing 1 V.S.A. § 319(a))).  The facts of this case are not disputed.  The parties filed a joint statement of undisputed facts where they agree that the emails are "almost exclusively related" to Dr. Fukagawa's editorial roles on the journals and her work on the committees.  The statement is also clear that USRTK is seeking Professor Fukagawa's emails related to her work on the journals and committees, not, for example, emails to these entities related to her work at UVM, which would present us with an altogether different case.  Moreover, the parties do not dispute that UVM qualifies as a public agency under the PRA.  See Animal Legal Def. Fund, Inc. v. Institutional Animal Care & Use Comm. of Univ. of Vt., 159 Vt. 133, 140, 616 A.2d 224, 227 (1992) (holding that UVM is subject to PRA).  Accordingly, the only issue before us is whether, as a matter of law, the emails related to Dr. Fukagawa's work on the journals and committees are public records under the PRA.

¶ 10.    We hold that the emails are not public records because they were not produced or acquired in the course of public agency business.  We reach this conclusion based on the language and purpose of the PRA, our case law on the subject, cases from other state courts interpreting their open-records laws, and the federal courts' interpretations of the Freedom of Information Act (FOIA).

¶ 11.    Whether the emails are public records is a question of statutory interpretation, an analysis in which we seek to effectuate the intent of the Legislature.  Toensing v. Attorney General, 2017 VT 99, ¶ 14, 206 Vt. 1, 178 A.3d 1000.  We begin with the language of the statute, for we presume that the Legislature "intended the plain, ordinary meaning of the adopted statutory language."  Id. (quotation omitted).  We also construe the PRA liberally in favor of disclosure, mindful of its strong policy favoring access to public records.  Norman v. Vt. Office of Court

4

Adm'r, 2004 VT 13, ¶ 4, 176 Vt. 593, 844 A.2d 769 (mem.); 1 V.S.A. § 315(a). The "determinative factor" in the definition of "public record" is "whether the document at issue is 'produced or acquired in the course of [public] agency business.' " Herald Ass'n, Inc. v. Dean, 174 Vt. 350, 354, 816 A.2d 469, 473 (2002) (quoting 1 V.S.A. § 317(b)). We have examined this language before.

¶ 12. In Herald Association, newspaper publishers requested Governor Howard Dean's daily schedule, which contained public and private information. 174 Vt. 350, 816 A.2d 469. We rejected the Governor's argument that any portion of a public record containing information not directly related to the Governor's duties or official acts is not covered by the PRA. Id. at 354-55, 816 A.2d at 473-74. Instead, we focused on the language of the Act in determining that the records must be produced or acquired in the course of public agency business to qualify as public records. Id. at 354, 816 A.2d at 473. We held that the Governor's schedule was a public record because it was "an integral and essential part of the daily functioning of the Governor's office," as it was "necessary to facilitate the execution of the Governor's various duties and to communicate with staff and the Governor's security personnel." Id. Central to our decision were the circumstances surrounding the record's creation and the role the record played in the day-to-day functioning of the Governor's office. Id.

¶ 13. We also discussed the definition of "public record" in Toensing, where we had to determine whether public records stored in agency employees' private email and text-messaging accounts were subject to disclosure under the PRA. 2017 VT 99. We answered that question affirmatively, noting that "[t]he PRA does not define 'public record' in reference to the location or custodian of the document, but rather to its content and the manner in which it was created." Id. ¶ 14; see also Trombley, 160 Vt. at 108, 624 A.2d at 862 (evaluating whether documents were exempt from disclosure "based on their content rather than where they are filed"). We also stressed the limited reach of the PRA to allow public inspection of public records—"those produced or

5

acquired in the course of public agency business." Toensing, 2017 VT 99, ¶ 22 (quotation marks omitted). We rejected the plaintiff's suggestion that "any and all communications with or documents related to" named state employees were disclosable. Id. (alteration omitted) (quotation marks omitted). And we disavowed the suggestion that the PRA reaches any records related "in any way" to the employees' employment at the state agency or related "in any way" to public business. Id. (quotation marks omitted). We drew a distinction between public records and nonpublic records and noted that subjecting the latter to public disclosure would raise concerns about the "constitutional privacy interests of state employees, would not further the public policy of open government, and would expand the PRA beyond its intended purpose." Id. ¶ 23.

¶ 14.    We clarify two aspects of Toensing in light of UVM's suggestion that the location of a document is irrelevant to whether the document is a public record, and USRTK's reliance on the professor's scope of employment. First, we did not hold that the location of a document is irrelevant to whether the document is a public record. We were concerned with communications related to agency business but stored in private accounts. See id. ¶ 9. We relied on the definition of "public record," which emphasizes the production or acquisition of a document "in the course of public agency business," and the purpose of the PRA, which is to ensure that the people can "review and criticize" government actions—a purpose that would be defeated if government officials could effectively hide government discussions in private accounts. See id. ¶¶ 14, 20-21 (quotations omitted). Thus, we had to look not just at the location of the records at issue but also determine whether their content reflected government business. Though not dispositive, whether an agency possesses a particular document is certainly a relevant factor in deciding whether the document is a public record.

¶ 15.    Second, we did not hold in Toensing that our public-records analysis turns on whether the record was created within the scope of the government officer's employment. We relied on a Washington Supreme Court case concluding that agency employees' text messages in

6

private cell phones were subject to that state's Public Records Act because agencies " 'act only through their employee-agents' and therefore 'a record that an agency employee prepares, owns, uses, or retains in the scope of employment is necessarily a record prepared, owned, used, or retained by' the agency." Id. ¶ 17 (quoting Nissen v. Pierce County, 357 P.3d 45, 52-54 (Wash. 2015)). While other courts and state legislatures have adopted a "scope of employment" test to establish whether a document is a public record, see, e.g., Pulaski County v. Ark. Democrat-Gazette, Inc., 260 S.W.3d 718, 721 (Ark. 2007), we have not adopted this test and do not do so here, cf. Herald Ass'n, 174 Vt. at 354-55, 816 A.2d at 473-74 (rejecting arguments that public records were only those related to Governor's duties or official acts).

¶ 16.    With these principles in mind, we turn to the PRA's statement of policy for further evidence of the Legislature's intent. There, the Legislature announced that "[o]fficers of government are trustees and servants of the people and it is in the public interest to enable any person to review and criticize their decisions even though such examination may cause inconvenience or embarrassment." 1 V.S.A. § 315(a). "All people," however, "have a right to privacy in their personal and economic pursuits, which ought to be protected unless specific information is needed to review the action of a governmental officer." Id. The Legislature then described public records, a description which, though not a conclusive definition, provides evidence of what the Legislature intended to capture with the term "public record."

> Public records contain information that allows government programs to function, provides officials with a basis for making decisions, and ensures continuity with past operations. Public records document the legal responsibilities of government, help protect the rights of citizens, and provide citizens a means of monitoring government programs and measuring the performance of public officials. Public records provide documentation for the functioning of government and for the retrospective analysis of the development of Vermont government and the impact of programs on citizens.

Id. § 315(b).

¶ 17. It is clear that by choosing the words "in the course of public agency business," the Legislature sought to shed light on government business, not the personal endeavors of state employees. Thus, an essential factor in determining whether a given record is a public record is whether its content reflects government—as opposed to personal—business. In that analysis, we look to the Legislature's description of public records for such considerations as whether the record contains information bearing on a government function, provides government officials with bases for making decisions, serves to ensure continuity with past government operations, or documents responsibilities of government actors. Other necessary factors to examine are the circumstances surrounding the record's creation, for example, by whom, for whom, and for what purpose the record was created; the role the record played in the functioning of the agency; and the record's location. Additional factors may become relevant in a given set of facts and underlying the analysis is the Legislature's instruction to construe the PRA liberally in favor of disclosure. See id. § 315(a).

¶ 18. Applying these factors, we hold that Dr. Fukagawa's emails are not public records. To begin, the emails were sent using UVM's server and they are stored on that server. As noted, these facts are relevant but not dispositive. There is wide consensus among state courts applying their open-records laws that the location of emails in public servers is insufficient by itself to make them public records. See, e.g., Serv. Emps. Int'l Union Loc. 925 v. Univ. of Wash., 447 P.3d 534, 540 & n.5 (Wash. 2019) (rejecting argument that regardless of content, any message stored on agency server would necessarily meet definition of public record and citing cases); Associated Press v. Canterbury, 688 S.E.2d 317, 331 (W. Va. 2009) (holding that "a personal e-mail communication by a public official or public employee, which does not relate to the conduct of the public's business, is not a public record subject to disclosure" and surveying case law from other jurisdictions). Federal courts interpreting the FOIA similarly recognize the distinction between personal and public records even when the records at issue are stored at a public agency.

8

See, e.g., <u>U.S. Dep't of Justice v. Tax Analysts</u>, 492 U.S. 136, 145 (1989) (observing that FOIA equivalent of "public record" does not include government employees' personal records "even though the materials may be physically located at the agency"); <u>Consumer Fed'n of Am. v. Dep't of Agric.</u>, 455 F.3d 283, 287, 289 (D.C. Cir. 2006) (recognizing that location is insufficient by itself to distinguish between agency and personal records and applying multiple-factor test including creation, possession, control, and use of document by agency). The facts that the emails were sent using the University's server and currently reside there do not control our analysis.

¶ 19. Turning to the content of the emails, it is undisputed that the emails relate to Dr. Fukagawa's work on the journals and committees, not her work at UVM or other UVM-related matters. Therefore, the content of the emails does not reflect government business. The content reflects the personal endeavors of a government employee. We fail to see how these emails, sent to and from entities unaffiliated with UVM, and concerning those entities' affairs, contain information bearing on UVM's functions, provide university officials with bases for making decisions, serve to ensure continuity with past university operations, or document responsibilities of UVM officials. This factor weighs heavily against a conclusion that the emails are public records.

¶ 20. As relevant to the circumstances surrounding the creation of the emails and the role they played in the functioning of UVM, we next consider the connections USRTK draws between the University and the professor's work on the journals and committees. USRTK first observes that the University's email policy requires employees to use their UVM email account only for UVM business, except for "occasional and incidental non-University matters." We are told that if Dr. Fukagawa sent thousands of emails to these entities using her UVM email account, then she must have done so as part of UVM business, not "occasional and incidental non-University matters." The argument is unpersuasive. Whether a given record is a public record cannot turn on the internal policies an agency chooses to implement at a particular time, on the extent to which

9

agency employees abide by those policies, or on the subjective assessment of employees as to whether they are conducting public business. To do so would be to hand the determination of what constitutes a public record over to the same government actors from whom disclosure is sought. As the Legislature recognized, government officials may have incentives to withhold documents from public scrutiny, including inconvenience and embarrassment. See 1 V.S.A. § 315(a). Accepting USRTK's argument would undermine the Legislature's policy of open government.

¶ 21. Next, USRTK observes that UVM benefits from, encourages, expects, and promotes the professor's work on such journals and committees. It maintains that UVM has adopted guidelines and promotion criteria that compel professors to pursue the editorial and committee work at issue. It further notes that UVM employs eleven people at the College of Medicine to promote the work of the College's faculty in order to attract donors and students and spends thousands of public dollars in this promotional work. These considerations, it argues, make Dr. Fukagawa's emails the business of UVM.

¶ 22. The connections USRTK draws between UVM and the professor's work on the journals and committees are too tenuous to make these emails public records. We do not doubt that UVM derives considerable benefits from the external work at issue here and that it spends public funds leveraging those benefits. But these emails concern the private workings of entities unaffiliated with UVM and thus "shed no light on how the government is conducting its business or spending taxpayer money." Griffis v. Pinal County, 156 P.3d 418, 422 (Ariz. 2007) (en banc). We might be persuaded otherwise if the records at issue quantified or described the extent of UVM professors' involvement in journal and committee work—a memorandum, for example, prepared for the purpose of promoting the professors' outside roles and the expertise they acquire therefrom, or retention and promotion assessments outlining a professor's editorial and committee accomplishments. Such records would be made for UVM and would have a role in the functioning of UVM. Documents reflecting the fact that professors do this type of outside work may allow

public inspection of UVM business. But the emails themselves, concerning the private affairs of these unaffiliated entities, were not created for UVM and serve no role in the functioning of the University.

¶ 23. Though we construe the PRA as liberally as possible in favor of disclosure, there are limits to how generously we can construe the Act if we are to remain faithful to the distinction between public and private records. The only factor that militates for a finding that the emails are public records is the location of the records. As discussed, this alone is not enough to make these emails public records. At bottom, the emails reflect the communications of a state employee engaged in a personal endeavor. That UVM benefits from these efforts, and spends public money leveraging those benefits, does not change the fact that the content of these emails does not reflect government business, the emails were not sent to or produced for UVM personnel, and the emails themselves played no role in the functioning of the University.

¶ 24. We note in closing that our conclusion is consonant with the disclosure exemption for records "produced or acquired by or on behalf of faculty, staff, employees, or students of [UVM] or the Vermont State Colleges in the conduct of study, research, or creative efforts, . . . whether such activities are sponsored alone by the institution or in conjunction with a governmental body or private entity," until published or otherwise released to the public. 1 V.S.A. § 317(c)(23). This exemption contemplates UVM or the Colleges' involvement in the study, research, or creative efforts—an involvement that would likely make records related to those activities public records. Note the Legislature's language: "sponsored alone by the institution or in conjunction with a governmental body or private entity." Id. The exemption assumes that UVM or the Colleges are involved in and may sponsor the study, research, or creative efforts. If Dr. Fukagawa's emails had been produced or acquired in journal or committee work sponsored by UVM, the emails may have been public records. The exemption may then have served the role of exempting the public records from disclosure. Our conclusion in this case does not render the

11

§ 317(c)(23) exemption superfluous. The exemption continues to protect records with sufficient connection to UVM and the Vermont State Colleges by exempting them from disclosure. There is no showing of such a connection here.

¶ 25. There is no genuine dispute of material fact. Because the requested records are not public records under the PRA, they are not disclosable and UVM is entitled to judgment as a matter of law.

Affirmed.

FOR THE COURT:

_____

Associate Justice

¶ 26. **EATON, J., dissenting.** The majority goes a bridge too far in holding that the documents requested by U.S. Right to Know (USRTK) are not agency records of the University of Vermont (UVM) acquired in the course of its business for purposes of Vermont's Public Records Act (PRA). For several reasons, I do not agree with that conclusion.

¶ 27. There are some points on which I wholeheartedly agree with the majority, including its discussion of the burden of proof, its rejection of the "scope of employment" test to determine whether records are acquired in the course of agency business for purposes of the PRA, and its recognition of the liberal construction to be afforded the PRA. See ante, ¶¶ 9, 15, 17. Where I part ways with the majority is in its determination that the records in question were not "acquired in the course" of UVM's business and thus are not subject to the PRA. See ante, ¶¶ 18-23. I disagree on that point and would remand to the trial court to determine whether one or more exemptions from disclosure, such as 1 V.S.A. § 317(c)(23), apply to some or all of these records.

¶ 28. First, the importance of the policy behind the PRA cannot be overstated. That the PRA is entitled to a liberal construction in making public records available to any person, which

the majority freely acknowledges, augers strongly in favor of document disclosure. But I believe the majority does not give sufficient consideration to this policy. See State v. Berard, 2019 VT 65, ¶ 12, n.1, 211 Vt. 39, 220 A.3d 759 (recognizing that to effectuate legislative intent, Court must "consider the plain language of a statute in the context and structure of the statute as a whole, rather than in isolation" (quotation omitted)). It is not simply a judicial interpretation of the policy behind the PRA; rather, it is an express statement of legislative policy embedded within the PRA itself.

> Officers of government are trustees and servants of the people and it is in the public interest to enable any person to review and criticize their decisions even though such examination may cause inconvenience or embarrassment. . . . Consistent with these principles, the General Assembly hereby declares that certain public records shall be made available to any person as hereinafter provided. To that end, the provisions of this subchapter shall be liberally construed to implement this policy, and the burden of proof shall be on the public agency to sustain its action.

1 V.S.A. § 315(a). This strongly stated and crystal-clear policy should not be lightly cast aside. See Hill v. Conway, 143 Vt. 91, 93, 463 A.2d 232, 233 (1983) (per curiam) (explaining that even plain-meaning rule "is no more than an aid in our efforts to determining legislative intent," and like all other rules of construction, is undergirded by "the fundamental rule that we must ascertain and give effect to the true intent of the legislature, for it is that intent which constitutes the law").

¶ 29. If this statement of policy were not enough, the PRA further provides, in 1 V.S.A. § 315(b), that public records are "essential" to the administration of government for many reasons, and "provide documentation for the functioning of government and for the retrospective analysis of the development of Vermont government and the impact of programs on citizens." As the majority recognizes, see ante, ¶ 16, public access to agency records serves several vital functions, including helping to safeguard the rights of Vermonters by furnishing a means through which to monitor government programs and measure the performance of public officials. This principle goes right to the heart of the relationship between government agencies and the public.

13

¶ 30. We have consistently held that the PRA expresses a strong legislative policy in favor of disclosure. Shlansky v. City of Burlington, 2010 VT 90, ¶ 12, 188 Vt. 470, 13 A.3d 1075 (explaining that "open access to governmental records is a fundamental precept of our society"); see also Rutland Herald v. City of Rutland, 2013 VT 98, ¶ 12, 195 Vt. 85, 84 A.3d 821 (stating that "the policy underlying the PRA clearly favors the right of access" (quotation omitted)); Price v. Town of Fairlee, 2011 VT 48, ¶ 13, 190 Vt. 66, 26 A.3d 26 (noting that Legislature's adoption of PRA "reaffirmed the fundamental principle of open government that public officials are trustees and servants of the people and . . . . [t]he PRA thus expresses a strong legislative policy favoring access to public documents and records" (quotations omitted)); Wesco, Inc. v. Sorrell, 2004 VT 102, ¶ 10, 177 Vt. 287, 865 A.2d 350 ("The [PRA] represents a strong policy favoring access to public documents and records."). Yet the majority departs from the fundamental policy behind the PRA in holding that the documents and records sought by USRTK are not public records.

¶ 31. Moving beyond the policy considerations of the PRA to the language of the Act itself, the PRA makes available for inspection or copying any public record of a public agency— such as UVM—subject to statutory exemptions from disclosure. 1 V.S.A. §§ 316(a), 317(b). The definition of public records in the PRA is expansive, consistent with the forceful policy animating the PRA itself. See Toensing v. Attorney General of Vermont, 2017 VT 99, ¶ 14, 206 Vt. 1, 178 A.3d 1000 (noting that we have "described this definition as 'sweeping.' "). Section 317 defines a "public record" or "public document" as "any written or recorded information, regardless of physical form or characteristics, which is produced or acquired in the course of public agency business." 1 V.S.A. § 317(b). "Business" is a broad term, encompassing in this context an agency's overall role or function, but also reaching more discrete "field[s] of endeavor," or even a particular "immediate task or objective." Business, Merriam-Webster Dictionary, https://www.merriam-webster. com/ dictionary /business [https://perma.cc/572L-D7YK].

14

Looking at the totality of the circumstances, as I believe we should, these records were acquired by UVM in the course of its business.

¶ 32. First, these records are not personal records of Dr. Fukagawa, clandestinely stored on the UVM computer system without UVM's knowledge or consent. While employed as a professor at UVM, Dr. Fukagawa stored the requested records on her uvm.edu email account. UVM has a policy regarding personal use of the UVM computer system which explains that information-technology resources such as a university email account are "critical" to "the success of our community members in their . . . teaching, scholarship, and service." The policy allows for employees' "occasional and incidental" use of the system for "non-University matters." It was admittedly not enforced, allowing for the storage of these records in the UVM computer system. UVM professors use the UVM computer systems for their noninstructional use, which was well-known to UVM and which it permitted, in violation of its own unenforced policy. At the same time, UVM recognizes and warns the users of its computer system that email and other documents stored on UVM computer equipment are subject to public-records laws and may be requested by and disclosed to members of the public. While we recognized in Toensing that the location of requested records for PRA purposes is not determinative, see 2017 VT 99, ¶ 14, the storage of the records in the UVM computer system would not have been possible had UVM foreclosed it by enforcing its policy. Similarly, the warning UVM provided to its computer users of potential application of the PRA to records stored on the UVM computer system would not have been necessary if UVM did not recognize that location of records within its system might expose those records to disclosure under the PRA.

¶ 33. More importantly, however, these records were acquired in the course of UVM's business because UVM's policies expected and encouraged professors, such as Dr. Fukagawa, to do scholarly work on non-UVM academic journals and committees and gave consideration to that work in making faculty promotions and in granting tenure. The work documented in these records

15

was an aspect of UVM's promotion matrix for professors. UVM also expected or could reasonably have anticipated that a professor's scholarly work would be done using UVM's computer system, especially since UVM turned a blind eye to how its system was used while concurrently encouraging the work generating those documents. The requested records are exactly the kind of documents UVM expected and encouraged its professors to generate to be considered for promotion, and are stored exactly where UVM permitted and expected them to be stored.

¶ 34. I do not disagree with the majority's articulation of the factors relevant to determining whether a given record concerns government business. Ante, ¶ 17. However, on the record before us, I cannot agree with the underlying conclusion that the emails are not public records because they "concern the private workings of entities unaffiliated with UVM and thus 'shed no light on how the government is conducting its business or spending taxpayer money.' " Ante, ¶ 22 (quoting Griffis v. Pinal County, 156 P.3d 418, 422 (Ariz. 2007) (en banc)). The record reflects that the emails sought by USRTK related to Dr. Fukagawa's editorial roles and work on advisory committees. This was work the University encouraged through its evaluation metrics and facilitated through its information-technology services. Further, as the majority acknowledges, UVM subsequently expended public funds to leverage the work for "considerable benefit[]." Ante, ¶ 22. In this context, the fact that the records concern the workings of unaffiliated entities cannot mean they are categorically incapable of shedding light on how UVM conducts its business or spends taxpayer money.

¶ 35. My conclusion that the emails at issue are public records is reinforced by the existence of § 317(c)(23), the PRA exemption for "data, records, or information produced or acquired by or on behalf of faculty . . . of [UVM] . . . in the conduct of study [or] research . . . whether such activities are sponsored alone by the institution or in conjunction with a governmental body or private entity" until publication, patent, or other disclosure by UVM or an authorized agent. 1 V.S.A. § 317(c)(23). The exemption applies to, among other things,

16

"correspondence." Id. Were correspondence generated or received by UVM faculty in the conduct of academic research categorically beyond the purview of documents produced or acquired in the scope of agency business, then the Legislature's inclusion of this language in § 317(c)(23) would be mere surplusage. Doncaster v. Hane, 2020 VT 22, ¶ 20, __ Vt. __, 229 A.3d 1026 ("We presume that language is inserted advisedly and that the Legislature did not intend to create surplusage." (quotation omitted)). Cf. Animal Legal Def. Fund, Inc. v. Institutional Animal Care & Use Comm. of Univ. of Vt., 159 Vt. 133, 140, 616 A.2d 224, 227 (1992) (concluding PRA applies to UVM because if it did not "there would be no need to carve out an exception for student records"). I presume that the Legislature included § 317(c)(23) advisedly because it contemplated that material similar to that at issue here would meet the statute's definition of a public record.

¶ 36. The majority posits that correspondence generated in the course of research "sponsored" by UVM—such that it is exempt from disclosure under § 317(c)(23)—would "likely" first meet the definition of a public record. Ante, ¶ 24. The majority concludes that the existence of the exemption does not undercut its holding that Dr. Fukagawa's emails are not public records. But the facts of this case illustrate the circularity of this logic: it is impossible to discern from the summary-judgment record before us whether the research at issue was "sponsored" by UVM in conjunction with separate entities. This is so because, although disclosure exemptions are to be construed narrowly, see Price, 2011 VT 48, ¶ 18, the term "sponsor" is a broad one, encompassing not only the provision of financial support or assumption of responsibility, but also the act of promoting, advocating for, or even favoring a venture. Legal Definition of Sponsor, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/sponsor#learn-more [https://perma.cc/82E9-4CWS]; see also Sponsor, Black's Law Dictionary (11th ed. 2019). Certainly, UVM is both incentivizing its professors to engage in such research and spending money to use the work involved for its own promotional purposes. Despite the questions this raises as to the applicability of the exemption, with a broad brush, the majority paints all records similar to

17

those at issue here as beyond the public's reach. This holding means that no court will have occasion to consider the more specific question of whether UVM, in any sense of the word, "sponsored" the research at issue in conjunction with another entity. I do not believe that the Legislature intended to thus collapse the courts' inquiry. Rather, § 317(c)(23) evinces a legislative expectation that materials like Dr. Fukagawa's emails will meet the broad definition of public records, and their disclosure should therefore hinge on the finer factual distinctions to be drawn in applying the exemptions.

¶ 37. In fact, the majority tacitly acknowledges the close relationship between the records in question and the University's business in explaining that they might reach a different conclusion "if the records at issue quantified or described the extent of UVM professors' involvement in journal and committee work." Ante, ¶ 22. But the distinction it draws finds no support in the statutory language, which describes public records as those "produced or acquired in the course of public agency business." 1 V.S.A. § 317(b) (emphasis added). Had the Legislature intended to limit the definition of public records to deliberative materials and exclude the source materials upon which such analysis is necessarily based, it could easily have omitted the words "or acquired" therefrom. See Smith v. Town of St. Johnsbury, 150 Vt. 351, 355, 554 A.2d 233, 237 (1988) ("Where the meaning of the words chosen is plain, we must give effect to the words chosen.").

¶ 38. Here, it is undisputed that UVM benefitted from the scholarly faculty work in terms of its academic reputation and in faculty and student recruitment, two aims which indisputably fall under the wide umbrella of UVM's "business." See supra, ¶ 31. The academic work done by faculty was promoted by UVM to the general public through publications it created discussing the results of that work, which were made and disseminated at a financial cost to UVM, through a staff it hired for that purpose. When UVM emphasizes and tracks the scholarly work done by its professors and seeks to benefit not only from that work, but the records documenting it—records which UVM receives and stores in its computer system—those are records "acquired in the course

18

of UVM's business."  I do not believe it is a proper application of the PRA to allow UVM to rely on the existence and content of the scholarly work documented in the requested records when it suits its purposes, such as in promoting the University, but to claim the documents are not records "acquired in the course of their business" when public disclosure does not suit its purposes.

¶ 39.    In short, UVM made this type of scholarly work part of the job of professors seeking tenure, allowed the records generated in the course of such pursuits to be stored in their computer system, and used the work thus documented in its consideration of faculty promotions and in promoting the University in the academic and public communities.  Given these factors, UVM should not now be heard to say records concerning that work are not records produced or acquired in the course of UVM's business, especially when the lens afforded to the determination of that issue is a liberal construction in favor of disclosure.

¶ 40.    A categorical holding that these are not agency records falling within the scope of the PRA goes too far.  I would remand for the reasons stated for consideration of exemptions to disclosure under the PRA and therefore respectfully dissent.

_____
Associate Justice